Robert A. BRECHEEN, Petitioner–Appellant,

v.

Dan REYNOLDS, Warden of the Oklahoma State Penitentiary, Respondent–Appellee.

No. 94–7084.

United States Court of Appeals, Tenth Circuit.

Oct. 14, 1994.

Gloyd L. McCoy of J.W. Coyle III, Inc., Oklahoma City, OK, Jack Gordon, Jr. of Gordon & Gordon, Claremore, OK, for petitioner.

A. Diane Blalock, Asst. Atty. Gen. (Susan Brimer Loving, Atty. Gen., with her on the briefs), Oklahoma City, OK, for respondent.

Before BALDOCK, BRORBY and EBEL, Circuit Judges.

BRORBY, Circuit Judge.

Robert Allen Brecheen appeals the denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254, along with the denial of his request for a stay of execution pursuant to 28 U.S.C. §§ 1651, 2251. Mr. Brecheen contends the district court failed to recognize several asserted constitutional errors relating to his murder conviction and corresponding death sentence. In this appeal, we are called upon to reexamine those asserted errors, which include the denial of a fair trial because of the denial of motion for change of venue and because of prosecutorial misconduct, denial of a fair sentencing phase because of ineffective assistance of counsel, insufficient mitigating instructions, and overbroad application of aggravating factors. We exercise jurisdiction under 28 U.S.C. § 1291 and we grant Mr. Brecheen's request for a certificate of probable cause pursuant to 28 U.S.C. § 2253. Finding no basis to grant relief, however, we affirm the district court's denial of Mr. Brecheen's petition.

## BACKGROUND

■ Mr. Brecheen was convicted by a jury of first degree murder and first degree burglary.[1] The jury imposed the death penalty after it found the existence of one aggravating circumstance, namely, that Mr. Brecheen knowingly created a great risk of death to more than one person. See Okla. Stat. tit. 21, § 701.12(2).

Mr. Brecheen was found guilty of killing Marie Stubbs in her living room one evening in March of 1983. From the bedroom, her husband, Hilton Stubbs, saw her fall to the floor. He then reached for his gun and rolled from his bed onto the bedroom floor. After the intruder came to the bedroom and fired into the empty bed, Mr. Stubbs fired at the intruder. The two exchanged fire once again as the intruder left the house and headed north. Though Mr. Stubbs could not identify the intruder, Mr. Brecheen was found by police approximately two hundred yards north of the Stubbs' house, severely wounded. At trial, Mr. Brecheen admitted to being present in the house and holding the gun that killed Mrs. Stubbs. He explained he was forced to the Stubbses' house by an unidentified man who also forced him to carry a gun to the door. The defense argued the gun went off accidentally.

■ On direct appeal, the Oklahoma Court of Criminal Appeals[2] affirmed his conviction and sentence of death.[3] *Brecheen I,* 732 P.2d

1. The facts described in this section are taken from the Oklahoma Court of Criminal Appeals' opinion affirming Mr. Brecheen's conviction on direct appeal. *Brecheen v. State,* 732 P.2d 889, 892 (Okla.Crim.App.1987), *cert. denied,* 485 U.S. 909, 108 S.Ct. 1085, 99 L.Ed.2d 244 (1988) (*Brecheen I*).

Written determinations of historical fact by state courts are presumed to be correct. 28 U.S.C. § 2254(d); *see Steele v. Young,* 11 F.3d 1518, 1520 n. 2 (10th Cir.1993). Considering the assertions made in Mr. Brecheen's petition, we believe that the presumption of correctness is appropriate. *Id.*

2. The Court of Criminal Appeals is vested with "exclusive appellate jurisdiction" over all criminal appellate actions. *See* Okla. Const., art. 7, § 4; Okla.Stat. tit. 20 § 40. In the words of that court, it is "the court of last resort in criminal cases." *State v. Blevins,* 825 P.2d 270, 271 (Okla.Crim.App.1992) (emphasis omitted).

3. Mr. Brecheen's counsel asserted twenty-four errors on direct appeal: (1) lack of fair trial for denial of change of venue; (2) improper for cause excusal of venireman; (3) insufficient evidence of "breaking" element of burglary; (4)–(5) improper instructions concerning the "breaking" element; (6) juror misconduct; (7) improper denial of access to victim's house; (8) improper rebuttal evidence of film from television news broadcast; (9) improper rebuttal testimony on issue of collateral importance; (10) improper rebuttal testimony from potentially biased expert; (11) prosecutorial misconduct; (12) improper admission of comments made by Mr. Brecheen in hospital in "semi-conscious" state; (13) improper admission of comments made under psychological police pressure; (14) improper jury instruction regarding the voluntariness of statements; (15) failure to instruct regarding exculpatory statement made in Mr. Brecheen's confession; (16) cumulative error; (17) failure to instruct against the use of impeachment evidence in guilt-innocence phase; (18) ineffective assistance of counsel during guilt-innocence phase; (19) unconstitutional application of state aggravating factors; (20) disproportionate sentence; (21) improper instructions regarding mitigating factors; (22) improper balancing of aggravating and mitigating factors; (23) unconstitutionality of state death penalty statutes in general; and

at 899. Mr. Brecheen then sought postconviction relief in the Oklahoma state courts.[4] The state district court denied relief after holding an evidentiary hearing on the question of ineffective assistance of counsel at the sentencing phase. The Oklahoma Court of Criminal Appeals affirmed the denial of postconviction relief after finding that the bulk of Mr. Brecheen's alleged errors were, or could have been, raised on direct appeal and were therefore not subject to review under Okla. Stat. tit. 22 § 1086.[5] *Brecheen v. State*, 835 P.2d 117, 121 (Okla.Crim.App.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1063, 122 L.Ed.2d 368 (1993) (*Brecheen II*).

Mr. Brecheen thereafter filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of Oklahoma. In an order dated June 30, 1994 (No. CIV 94–318–S), the Chief Judge of the district denied Mr. Brecheen's petition and his motion for a stay of execution, which had been set for July 6, 1994. On July 1, 1994, we granted Mr. Brecheen's emergency application for a temporary stay of execution to allow for the appointment of counsel, along with expedited appeal and oral argument. *See Coleman v. Brown*, 753 F.2d 832, 833 (10th Cir.1985). On appeal to this court, Mr. Brecheen reasserts the six arguments offered in his petition for a writ of habeas corpus in the federal district court: (1) denial of fair trial based on the trial court's denial

of his motion for a change of venue; (2) denial of a fair trial due to prosecutorial misconduct; (3) violation of due process during sentencing for failure to offer a "presumption of life" instruction; (4) violation of the Eighth Amendment during sentencing for overbroad use of a statutory aggravating circumstance; (5) ineffective assistance of counsel during the sentencing phase; and (6) cumulative error. We address these claims *seriatim*.

## DISCUSSION

### I. Change of Venue

Mr. Brecheen initially claims that the state trial court erred in denying his motion for a change of venue. He claims that under the facts of this case, the actions of the state trial court amounted to a denial of his right to a fair trial by impartial jurors under the Sixth and Fourteenth Amendments. He further alleges that the standard applied by the appellate court in reviewing the state trial courts' change of venue decisions is similarly unconstitutional as a violation of due process.

### A.

Before jury selection, Mr. Brecheen moved for a change of venue from Carter County, Oklahoma, specifically from the town of Ardmore where the crime had occurred. Coun-

---

(24) double jeopardy. *See Brecheen I*, 732 P.2d at 892–99.

**4.** Oklahoma, like many jurisdictions, has statutorily limited the availability of postconviction relief. *See* Okla.Stat. tit. 22, §§ 1080–1088 ("Oklahoma Post–Conviction Procedure Act"). The Oklahoma Court of Criminal Appeals has repeatedly stated that postconviction relief is not intended to serve as a " 'second appeal under the mask of post-conviction application.' " *Hale v. State*, 807 P.2d 264, 267 (Okla.Crim.App.) (quoting *Ellington v. Crisp*, 547 P.2d 391, 393 (Okla. Crim.App.1976)), *cert. denied.* —— U.S.——, 112 S.Ct. 280, 116 L.Ed.2d 231 (1991); *accord Smith v. State*, 826 P.2d 615, 616 (Okla.Crim.App.), *cert. denied*, —— U.S. ——, 113 S.Ct. 405, 121 L.Ed.2d 331 (1992).

That court has further held that § 1086 of its Post–Conviction Procedure Act embodies the principles of *res judicata* and precludes state collateral review of issues actually raised on direct appeal, as well as those issues that could have been raised on direct appeal but were not.

*Hale*, 807 P.2d at 266–67 (citing *Coleman v. State*, 693 P.2d 4, 5 (Okla.Crim.App.1984); *Castleberry v. State*, 590 P.2d 697, 703 (Okla.Crim. App.1979)). In essence, then, postconviction relief is reserved only for the rare set of circumstances where a particular claim "could not have been raised on direct appeal." *Johnson v. State*, 823 P.2d 370, 372 (Okla.Crim.App.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1984, 118 L.Ed.2d 582 (1992).

**5.** The claims that were not reviewed included: (1) ineffective assistance of counsel during sentencing phase; (2) prosecutorial misconduct; (3) failure to give "anti-sympathy" instruction; (4)–(5) insufficient foundation for jury's decision to assess death penalty; (6) unconstitutional aggravating factor; (7) inadequate instructions during the sentencing phase; and (8) juror misconduct. *See Brecheen II*, 835 P.2d at 118–19 & n. 1. The only claims that the court reviewed were two change of venue issues and one matter relating to the disclosure of exculpatory evidence. *Id.* at 119–21.

sel for Mr. Brecheen claimed local and statewide newspaper and television accounts contained statements of facts that were still disputed and could be misconstrued by potential jurors as undisputed. As counsel explained, though, "we don't take the position that this pretrial publicity has been outlandish or there has been any undue or prejudicial invasion of Mr. Brecheen's rights.... [T]he problem is a good bit more subtle." The trial court reserved judgment on the motion until after making an attempt to seat a jury. During voir dire, an additional concern for defense counsel arose as most venirepersons indicated they had been past customers of the victim's western wear shop in town.

All potential jurors were asked by the trial court about their relationship with the victim and her husband, of their awareness of various media accounts, and whether such knowledge would impair their ability to reach an impartial decision. Both the prosecuting and defense attorneys also inquired along these lines. Eleven of the thirty-nine venirepersons were excluded for cause because of their exposure to pretrial publicity or friendship with the victim and her family. Of the jurors finally empaneled, all but one were prior customers of the victim's store. One juror knew the victim's daughter in a business context. All jurors were exposed to media accounts of the crime, but some expressed doubt at their ability to recall details from those accounts. One juror admitted to forming an opinion during his reading of the account but stated he could dismiss that opinion once the trial began. All jurors were asked, at least twice, whether such knowledge would influence their judgment, and all responded negatively. Defense counsel waived two peremptory challenges as the jurors were seated.

Following the empaneling, the trial court held another hearing to rule on the motion for change of venue and concluded the jurors' promises of impartiality could be trusted. This decision was affirmed on direct appeal.

An exhaustive voir dire was conducted at trial. Those who served on the jury stated they could fairly and impartially judge the case on the evidence presented. Those who formed opinions concerning appellant's guilt or doubted their ability to serve impartially were excused. We find there was adequate safeguard of the jury process ... and the need for a change of venue was not established.

*Brecheen I,* 732 P.2d at 893 (citation omitted). During state postconviction proceedings, the Oklahoma Court of Appeals again affirmed. "[W]hile the jury was not totally ignorant of the facts and the circumstances behind this case, the trial court's decision to retain venue in Carter County was correct and no relief is warranted on this ground." *Brecheen II,* 835 P.2d at 120. The federal district court rejected this argument as well, concluding that under applicable Supreme Court precedent, Mr. Brecheen's right to due process was not violated by the denial of his motion to change venue. We agree.

Our review of a state trial court's rulings on juror impartiality is "limited to enforcing the commands of the United States Constitution." *Mu'Min v. Virginia,* 500 U.S. 415, 422, 111 S.Ct. 1899, 1903, 114 L.Ed.2d 493 (1991). A federal habeas court may reverse a state trial court's findings only upon a showing of " 'manifest error.' " *Id.* at 428, 111 S.Ct. at 1907 (quoting *Patton v. Yount,* 467 U.S. 1025, 1031, 104 S.Ct. 2885, 2888–89, 81 L.Ed.2d 847 (1984)); *Church v. Sullivan,* 942 F.2d 1501, 1518 (10th Cir.1991). Part of the rationale behind the limited nature of federal review of a state trial court's findings is that "[t]he state trial judge had the benefit of observing the general demeanor of the jurors as the basis for his general finding." *Church,* 942 F.2d at 1519; *see also Patton,* 467 U.S. at 1038, 104 S.Ct. at 2892–93 (trial court's resolution of demeanor is entitled to "special deference"). Therefore, a habeas petitioner seeking to establish this type of due process violation must demonstrate either that the trial resulted in actual prejudice or that it gave rise to a presumption of prejudice because it involved "such a probability that prejudice will result that it is deemed inherently lacking in due process." *Estes v. Texas,* 381 U.S. 532, 542–43, 85 S.Ct. 1628, 1633, 14 L.Ed.2d 543 (1965). Mr. Brecheen points to no actual hostility or impartiality by the jurors; therefore, we limit our

discussion to whether Mr. Brecheen availed himself of a presumption of prejudice.

We do not read Mr. Brecheen's argument to depict the inflammatory local media publicity as is found in several Supreme Court decisions. *See Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) (due process violation from five volumes of news clippings, accommodation for the press in the courthouse and courtroom, publication of potential juror's names and addresses allowing the public to contact potential jurors pretrial); *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) (defendant's filmed confession repeatedly broadcast on the local television news of the small town); *Estes,* 381 U.S. 532, 85 S.Ct. 1628 (eleven volumes of press clippings, pretrial hearings broadcast on local television). We agree with the federal district court that there is no indication from review of the newspaper accounts or from defense counsel's depictions, during the pretrial and post-voir dire hearings, that the influence of the media so pervaded the proceedings as to deny Mr. Brecheen due process.

■■■ In the absence of pervasive media influence, then, a presumption of prejudice may be based upon "indications in the totality of the circumstances that petitioner's trial was not fundamentally fair." *Murphy v. Florida,* 421 U.S. 794, 799, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975). Fundamentally unfair circumstances may be indicated by an inflammatory atmosphere within the community or courtroom, by specific statements of jurors, or by the difficulty with which an impartial panel was selected. *Id.* at 800–03, 95 S.Ct. at 2036–38. Under a manifest error standard, however, " '[t]he relevant question is not whether the community remembered the case, but whether the jurors ... had such fixed opinions that they could not judge impartially the guilt of the defendant.' " *Mu'Min,* 500 U.S. at 430, 111 S.Ct. at 1908 (quoting *Patton,* 467 U.S. at 1035, 104 S.Ct. at 2890–91).

Observing the entire record, we find no evidence of a fundamentally unfair proceed-ing. As in *Mu'Min,* "[t]he *voir dire* examination conducted by the trial court in this case was by no means perfunctory." *Mu'Min,* 500 U.S. at 431, 111 S.Ct. at 1908. The trial court responded to petitioner's pretrial motion with extensive voir dire and fulfilled his obligation by making a specific finding that the panel's statements of impartiality could be trusted. *See Mu'Min,* 500 U.S. at 425, 111 S.Ct. at 1905 (noting that the trial court must ultimately decide whether a juror's statements of impartiality are "to be believed"); *id.* at 427, 111 S.Ct. at 1906 (stating that the trial court has "wide discretion" in conducting voir dire and noting that "primary reliance on the judgment of the trial court makes good sense").

■■■ Only one colloquy with a potential juror raises a momentary concern. One potential juror admitted he had formed a prior opinion while reading a newspaper story describing the crime. With questioning from defense counsel, though, the potential juror clearly stated he could "approach the trial without an opinion as to [Mr. Brecheen's] guilt or innocence." Defense counsel did not request the potential juror be excused for cause, nor did he elect to use a peremptory challenge for this potential juror. We are satisfied that no fundamental error occurred at this point. "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard." *Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 1642–43, 6 L.Ed.2d 751 (1961). Finally, the fact that slightly over one-quarter of the venire was excluded for cause does not indicate a pervasive community or courtroom hostility toward Mr. Brecheen. *See Murphy,* 421 U.S. at 803, 95 S.Ct. at 2037–38 (exclusion of under one-quarter of the venire does not indicate "a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own"). We find no manifest error in the state trial court's denial of change of venue.[6]

6. In his argument before this court, Mr. Bre-

cheen contends the federal district court improp-

**1352**

B.

■■■■ The second half of Mr. Brecheen's argument is that the Oklahoma Court of Criminal Appeals applied an unconstitutional standard of review in deciding whether the trial court properly denied his motion to change venue.[7] Specifically, Mr. Brecheen asserts that the use of the "virtual impossibility" standard,[8] which was applicable at the time of his trial and his direct appeal,[9] is unconstitutional.

In rejecting this claim, we reiterate our only concern is whether Mr. Brecheen's *federal constitutional right* to a fair and impartial jury, guaranteed to him by the Fourteenth Amendment, was violated in this case. *See Mu'Min,* 500 U.S. at 422, 111 S.Ct. at 1903–04 (citing *Turner v. Murray,* 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986); *Ristaino v. Ross,* 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976); *Ham v. South Carolina,* 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973)); *see also Brecheen v. Oklahoma,* 485 U.S. 909, 910, 108 S.Ct. 1085, 1085–86, 99 L.Ed.2d 244 (1988) (Marshall, J., dissenting from denial of certiorari) (indicating the issue is "whether particular state standards for change of venue comport with the requirements of due process."). For reasons stated above, we have already concluded that the

procedures employed by the state trial court were constitutionally adequate and that Mr. Brecheen's rights were not violated. Therefore, even assuming, *arguendo,* that the use of the virtual impossibility standard could be unconstitutional under a particular set of circumstances, *see id.* at 911, 108 S.Ct. at 1086–87 minimal standards of due process were in fact afforded to Mr. Brecheen *in this case.* Therefore, the issue of what substantive standard of review was employed by the Oklahoma courts is irrelevant because this trial was fundamentally fair. Therefore, we reject this assignment of error.

In sum, we have measured the actions of the state trial court concerning the jury selection process and the change of venue issue against the standard of due process that is required by the United States Constitution. Having done so, we conclude that the Oklahoma state courts did not violate Mr. Brecheen's constitutional right to a fair and impartial jury.

## II. Prosecutorial Misconduct

Mr. Brecheen next asserts a claim of prosecutorial misconduct, alleging he was denied a fair trial because of comments made by the prosecutor throughout the course of the trial. Because Mr. Brecheen's trial counsel did not

---

erly found a waiver of issues regarding the composition of the jury because defense counsel did not use two peremptory challenges. The federal district court did not hold petitioner's change of venue argument was waived, but only that any residual issues relating to jury composition were waived. *Brecheen v. Reynolds,* No. CIV–94–318–S, slip op. at 19 n. 4 (citing *Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988)). Since we divine no additional issues relating to jury composition raised by the petitioner, we do not treat the federal district court's conclusion as error.

7. Mr. Brecheen does not assert that the Oklahoma courts have denied him an *opportunity* to file a motion for a change of venue, an opportunity that is required by the due process clause. *See Groppi v. Wisconsin,* 400 U.S. 505, 511, 91 S.Ct. 490, 493–94, 27 L.Ed.2d 571 (1971) (finding a Wisconsin statute that categorically denied individuals accused of misdemeanors with an "opportunity" to show "that a change of venue *is* required in *his* case" constitutionally infirm) (emphasis in original). Instead, he challenges the substantive standard of review.

8. "It is only when a criminal defendant establishes by clear and convincing evidence that a fair trial is a *virtual impossibility* that such a motion should be granted." *Brecheen I,* 732 P.2d at 893 (emphasis added).

9. The Oklahoma Court of Criminal Appeals has recently abandoned its standard of review for denials of motions to change venue. *See Brown v. State,* 871 P.2d 56, 61–62 (Okla.Crim.App.) (expressly overruling the "virtual impossibility" standard in favor of a requirement that defendant show a fair and impartial trial is "improbable"), *cert. denied,* —— U.S. ——, 115 S.Ct. 517, 130 L.Ed.2d 423 (1994). In addition, although the Oklahoma Court of Criminal Appeals reviewed Mr. Brecheen's argument on this point in his application for postconviction relief under a standard that was less stringent than the virtual impossibility standard applied on direct appeal, *see Brecheen II,* 835 P.2d at 120 (following a two-step test used in *Coates v. State,* 773 P.2d 1281, 1286 (Okla.Crim.App.1989)), we must examine the standard in place at the time of Mr. Brecheen's direct appeal in order to determine whether it comported with federal due process requirements.

make a timely objection to any of the comments forming the basis for this claim, the Oklahoma Court of Criminal Appeals' review on direct appeal was limited to deciding whether this constituted "fundamental error." *Brecheen I,* 732 P.2d at 896 (citing *Rushing v. State,* 676 P.2d 842 (Okla.Crim. App.1984)). Because the alleged errors did not rise to this level, the Court of Criminal Appeals rejected this claim. *Id.* In reviewing Mr. Brecheen's application for postconviction relief, the Oklahoma Court of Criminal Appeals declined to hear this claim pursuant to state law and therefore did not address it. *Brecheen II,* 835 P.2d at 119 n. 1.

■ Before the district court, the State asserted, *inter alia,* this issue was procedurally barred. The district court concluded that this claim had been exhausted and therefore addressed it on the merits without specifically deciding the procedural bar issue. We do not, however, fault the district court for not deciding this question because of some ambiguity in the State's assertion of a procedural bar. We conclude the state court's judgment does not rest on an "independent" state ground and therefore does not act as a procedural bar to habeas corpus review. On the merits, however, we find no error.

### A.

#### 1.

It is a well-established principle that the Supreme Court will not review a state court's interpretation of federal law on direct review, "if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson,* 501 U.S. 722, 729, 111 S.Ct. 2546, 2553–54, 115 L.Ed.2d 640 (1991) (citing, *inter alia, Klinger v. Missouri,* 80 U.S. (13 Wall.) 257, 263, 20 L.Ed. 635 (1872)). A state court's finding is considered "independent if it is separate and distinct from federal law." *Andrews v. Deland,* 943 F.2d 1162, 1188 n. 40 (10th Cir. 1991) (citing *Ake v. Oklahoma,* 470 U.S. 68, 75, 105 S.Ct. 1087, 1092, 84 L.Ed.2d 53 (1985)), *cert. denied,* — U.S. ——, 112 S.Ct. 1213, 117 L.Ed.2d 451 (1992). A state court's

finding is deemed to be "adequate" if it is applied "evenhandedly"; that is, if it is "'strictly or regularly followed.'" *Andrews,* 943 F.2d at 1188 n. 40 (quoting *Hathorn v. Lovorn,* 457 U.S. 255, 263, 102 S.Ct. 2421, 2426–27, 72 L.Ed.2d 824 (1982)). In the direct review setting, application of the adequate and independent state ground doctrine is jurisdictional: resolution of a federal issue could not affect a judgment that was adequately supported by an alternative ruling of state law, and therefore, review by the Supreme Court "could amount to nothing more than an advisory opinion" in violation of U.S. Const. art. III. *Herb v. Pitcairn,* 324 U.S. 117, 125–26, 65 S.Ct. 459, 462–64, 89 L.Ed. 789 (1945).

■ Although well-established in the direct review context, it was not until the relatively recent decision in *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), that the Supreme Court extended the adequate and independent state ground doctrine to federal habeas review. *Id.* at 87, 97 S.Ct. at 2506; *see also County Court of Ulster County v. Allen,* 442 U.S. 140, 148, 99 S.Ct. 2213, 2220, 60 L.Ed.2d 777 (1979). In the habeas context, however, the adequate and independent state ground doctrine is not jurisdictional but "is grounded in concerns of comity and federalism." *Coleman,* 501 U.S. at 730, 111 S.Ct. at 2554, (discussing the different underpinnings of the adequate and independent state ground doctrine on direct and collateral review). The doctrine provides that "[w]hen a state-law default prevents the state court from reaching the merits of a federal claim, that claim can ordinarily not be reviewed in federal court." *Ylst v. Nunnemaker,* 501 U.S. 797, 801, 111 S.Ct. 2590, 2593, 115 L.Ed.2d 706 (1991). Review is precluded "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman,* 501 U.S. at 750, 111 S.Ct. at 2565; *see Harris v. Reed,* 489 U.S. 255, 263, 109 S.Ct. 1038, 1043–44, 103 L.Ed.2d 308 (1989); *Ballinger v. Kerby,* 3 F.3d 1371, 1375 (10th Cir.1993).

■ The law of procedural defaults thus applies to preclude federal habeas review of claims that have not been adjudicated on the merits by a state court because of noncompliance with a state procedural rule. *E.g., Coleman*, 501 U.S. at 728, 111 S.Ct. at 2553; *Wainwright*, 433 U.S. at 87, 97 S.Ct. at 2506–07. Although earlier habeas corpus precedents may have suggested to the contrary, *Coleman* explicitly recognizes the "important interest in finality served by state procedural rules, and the significant harm to the States that results from the failure of federal courts to respect them." *Coleman*, 501 U.S. at 750, 111 S.Ct. at 2565 (citing *McCleskey v. Zant*, 499 U.S. 467, 491, 111 S.Ct. 1454, 1468–69, 113 L.Ed.2d 517 (1991)). It is clear these precepts apply with equal force in capital cases. *See Sawyer v. Whitley*, — U.S. —, —, 112 S.Ct. 2514, 2518, 120 L.Ed.2d 269 (1992); *Smith v. Murray*, 477 U.S. 527, 538, 106 S.Ct. 2661, 2668, 91 L.Ed.2d 434 (1986); *Parks v. Reynolds*, 958 F.2d 989, 994–95 (10th Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 1310, 117 L.Ed.2d 530 (1992). With this understanding of the law of procedural defaults, we must now determine whether Mr. Brecheen's prosecutorial misconduct claim is procedurally barred.

### 2.

In the present case, the Oklahoma Court of Criminal Appeals' review of Mr. Brecheen's prosecutorial misconduct claim was limited to review for "fundamental error." *See Brecheen I*, 732 P.2d at 896. Despite what appears to be a ruling based on non-compliance with a state procedural rule, *Ake* holds that such a determination amounts to an adjudication of the merits of a federal claim under Oklahoma law for purposes of deciding whether a claim is procedurally barred.

In *Ake*, the Supreme Court, interpreting Oklahoma law, held Oklahoma's waiver rule does not apply to fundamental trial error, which necessarily included federal constitutional error. *Ake*, 470 U.S. at 74–75, 105 S.Ct. at 1091–92. The Court then stated:

Thus, the State has made application of the procedural bar depend on an antecedent ruling on federal law, that is, on the determination of whether federal constitutional error has been committed. Before applying the waiver doctrine to a constitutional question, the state court must rule, either explicitly or implicitly, on the merits of the constitutional question.

*Id.* at 75, 105 S.Ct. at 1092. Therefore, because this state procedural ruling is dependent on an antecedent ruling of federal law, "the state-law prong of the court's holding is not independent of federal law." *Id.; cf. Gutierrez v. Moriarty*, 922 F.2d 1464, 1469 (10th Cir.) (comparing New Mexico law as to waiver of constitutional rights with Oklahoma law), *cert. denied*, — U.S. —, 112 S.Ct. 140, 116 L.Ed.2d 106 (1991). Therefore, under the holding of *Ake*, we conclude the Court of Criminal Appeals' decision did not rest on an "independent" state law ground and therefore this claim is not procedurally barred.[10] Therefore, we must now address the merits of this claim.

### B.

■ Mr. Brecheen's prosecutorial misconduct claim is based on several prejudicial statements made during the prosecution's voir dire and closing argument. He argues the prosecutor improperly (1) attempted to frighten the jury into convicting Mr. Brecheen; (2) called for revenge; (3) made deterrence arguments to the jury; (4) appealed to the jury's passions and prejudices; (5) misstated evidence; (6) appealed to the jury's sense of civic responsibility; (7) attacked defense counsel; and (8) used Biblical references. In addition, Mr. Brecheen briefly suggests the cumulative effect of these statements amounts to a constitutional violation.

The following illustrates the tenor of the prosecutor's remarks:

Murder is the coldest word.... It's cold. You think about the word and it will run

---

10. On direct appeal, the Oklahoma Court of Criminal Appeals reviews claims not preserved at trial for "fundamental error." This fundamental error exception to claims that would otherwise be barred is limited to the direct review setting and does *not* apply to claims raised for the first time in state post-conviction proceedings. *See Steele*, 11 F.3d at 1522 n. 5.

chills down your spine, because it's [sic] what it's talking about is the deliberate intention of one human being to take from another the most precious thing they have, and that's their human life.

. . . .

I submit to you ladies and gentlemen, that this tragedy, death of Mrs. Stubbs—talk about somebody suffering, suffering, pleading for sympathy and if I wanted to do that, I could do that right now. He hasn't suffered anything—not like she did, to be standing in your own home, comfortably watching TV, somebody come to your door with a gun—thinking that's your wife, your husband as they flee from that door and that gun goes off in their head. Think about waking up and walking to the living room and finding that laying there.

. . . .

How much harder, cooler, calmer can an individual get than to take a gun and go to an acquaintance's home, kill them when they answer the door and try to kill another one. How much colder and harder can a human being get, to go in there with the intention of taking a human life, before you ever get there, thinking about it, to plan it out, to walk up there and do it. You can't, ladies and gentlemen. There's no harder you can get. There's no—no way a human mind can get any harder than that; no remorse, nothing.

. . . .

The murder ... is a crime against, and a threat to every other member of that community, county and state, and unless it is punished, unless it is carried out, then we have no government, then we have no law, then we have chaos and anarchy.... The average person can take a hundred locks and put on their doors, have all of their guns and be prepared to fend off any attack, anybody that wants to come in, any strong man that wants to take over, anybody that wants to take over can do it, unless the law works, and the law works here. It works with twelve people.

■ Counsel for Mr. Brecheen incorrectly directs us to violations of state law allegedly caused by these statements. Our review as a federal habeas court is for feder-

al constitutional violation; "the narrow one of due process, and not the broad exercise of supervisory power." *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974); *accord Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471–72, 91 L.Ed.2d 144 (1986). As we noted in *Coleman v. Brown*, 802 F.2d 1227 (10th Cir.1986), *cert. denied*, 482 U.S. 909, 107 S.Ct. 2491, 96 L.Ed.2d 383 (1987), "[r]emarks that would cause us to reverse in a direct appeal of a federal conviction [under our supervisory powers] are not necessarily grounds for reversal when spoken in state courts." *Id.* at 1237.

■ In general, *Donnelly* directs us to limit our review of this type of claim to the question of whether the challenged statements "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643, 94 S.Ct. at 1871; *accord Darden*, 477 U.S. at 181, 106 S.Ct. at 2471–72; *Mahorney v. Wallman*, 917 F.2d 469, 472 (10th Cir.1990). In making this "fundamental fairness" determination, we must "consider[ ] the pertinent surrounding circumstances at trial," *Mahorney*, 917 F.2d at 473, including the strength of the state's case relating to the petitioner's guilt, *Coleman v. Brown*, 802 F.2d at 1237, and the prejudice, if any, attributable to the prosecutor's comments, *Mahorney*, 917 F.2d at 472–73. If, however, the impropriety complained of " 'effectively deprived the defendant of a *specific constitutional right*, a habeas claim may be established without requiring proof that the entire trial was thereby rendered fundamentally unfair.' " *Yarrington v. Davies*, 992 F.2d 1077, 1079 (10th Cir.1993) (emphasis added) (quoting *Mahorney*, 917 F.2d at 472).

■ Mr. Brecheen does not argue the prosecutor's statements violated a specific constitutional right; therefore, we analyze this claim under the fundamental fairness standard of *Donnelly*, *see Yarrington*, 992 F.2d at 1080, and not *Mahorney* as Mr. Brecheen urges. *See Coleman v. Saffle*, 869 F.2d 1377, 1395 (10th Cir.1989), *cert. denied*, 494 U.S. 1090, 110 S.Ct. 1835, 108 L.Ed.2d 964 (1990). After a careful review of the

**1356**

totality of circumstances of the trial, we do not find the statements of the prosecutor so prejudiced the jury against the petitioner as to deny him the fundamental fairness to which he is entitled under the Constitution.

█ "[I]t is not enough that the prosecutor['s] remarks were undesirable or even universally condemned." *Darden,* 477 U.S. at 181, 106 S.Ct. at 2471. Writing separately on Mr. Brecheen's direct appeal, one judge of the Oklahoma Court of Criminal Appeals commented:

> It is difficult to understand why the State would risk reversal or modification by making such clearly improper and unnecessary comments during closing argument. However, in light of the strong evidence of guilt, the failure to make timely objections and requests for admonishments to disregard, and the failure to show prejudice, it is unnecessary to reverse or modify the conviction.

*Brecheen I,* 732 P.2d at 900 (Parks, Presiding Judge, concurring). In addition, the district court noted "some of the prosecutor's statements were unnecessary and improper," but also confirmed that "[c]onsideration of the trial record reveals there is convincingly strong evidence against Petitioner." *Brecheen,* No. CIV–94–318–S, slip op. at 33, 35. While "improper appeals to societal alarm" and requests for "vengeance for the community to set an example" are unwarranted, they are also not the type of comments that the Supreme Court has suggested might amount to a due process violation. *See Darden,* 477 U.S. at 181–82, 106 S.Ct. at 2471–72, quoted in *Saffle,* 869 F.2d at 1396. Thus, while we agree with the determination of courts before us that the conduct of the state prosecutor was unbecoming to his office and needlessly jeopardized his case, we also agree that Mr. Brecheen has not shown how these remarks, either individually or collectively, violated his right to due process.

### III. Sentencing Error and Jury Instructions

Mr. Brecheen next assigns error relating to the instructions given to the sentencing jury.

In his direct appeal, Mr. Brecheen argued, *inter alia,* that permitting the imposition of the death penalty if the defendant knowingly created a great risk of danger to more than one person under Oklahoma law violated the Eighth Amendment because it was unconstitutionally overbroad. The Oklahoma Court of Criminal Appeals rejected this challenge in reliance on its existing precedent. *See Brecheen I,* 732 P.2d at 899. In his subsequent application for postconviction relief, Mr. Brecheen attempted to reassert this claim along with another claim regarding the trial court's failure to give a so-called "presumption of life" instruction. The Oklahoma Court of Criminal Appeals invoked Okla.Stat. tit. 22 § 1086 and concluded the first claim had already been asserted and would not be reconsidered and the second claim could have been asserted on direct appeal such that it was now barred by *res judicata. See Brecheen II,* 835 P.2d at 119 n. 1. We address these claims in reverse order.

### A.

█ Mr. Brecheen's allegation that the trial court erred by failing to give a "presumption of life" instruction was not raised on direct appeal. For reasons discussed earlier, we recognize Oklahoma's procedural bar to claims that were waived on direct appeal as an adequate and independent state ground for not reaching the merits of the claim. *See Steele,* 11 F.3d at 1522 & n. 5. Therefore, unless Mr. Brecheen can show that one of the narrow, recognized exceptions to the procedural bar rule is applicable, we will not, out of respect for the Oklahoma courts' procedural rules, adjudicate the merits of this claim. *See Coleman,* 501 U.S. at 750, 111 S.Ct. at 2564–65. Mr. Brecheen does not argue that he has shown cause and prejudice to override his procedural default; instead, he relies on the "fundamental miscarriage of justice" exception. *See Murray v. Carrier,* 477 U.S. 478, 495, 106 S.Ct. 2639, 2649, 91 L.Ed.2d 397 (1986), quoted in *Harris,* 489 U.S. at 262, 109 S.Ct. at 1042–43; *see also Coleman,* 501 U.S. at 749–50, 111 S.Ct. at 2564–65.

█ The Supreme Court recently expounded on the narrow scope of this excep-

tion and indicated it is equivalent to a showing of "actual innocence." *See Herrera v. Collins,* —— U.S. ——, ——, 113 S.Ct. 853, 862, 122 L.Ed.2d 203 (1993); *Sawyer v. Whitley,* —— U.S. ——, ——, 112 S.Ct. 2514, 2518–19, 120 L.Ed.2d 269 (1992) (discussing *Kuhlmann v. Wilson,* 477 U.S. 436, 454, 106 S.Ct. 2616, 2627, 91 L.Ed.2d 364 (1986) (plurality opinion)). "The fundamental miscarriage of justice exception is available 'only where the prisoner *supplements* his constitutional claim with a colorable showing of factual innocence.'" *Herrera,* —— U.S. at ——, 113 S.Ct. at 862 (emphasis in original) (quoting *Kuhlmann,* 477 U.S. at 454, 106 S.Ct. at 2627 (plurality opinion)). This rule is "grounded in the 'equitable discretion' of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons," *Herrera,* —— U.S. at ——, 113 S.Ct. at 862 (citing *McCleskey,* 499 U.S. at 494, 111 S.Ct. at 1470), and these standards apply with full force in capital cases. *See Murray v. Giarratano,* 492 U.S. 1, 9, 109 S.Ct. 2765, 2769–70, 106 L.Ed.2d 1 (1989) (plurality opinion), quoted in *Herrera,* —— U.S. at ——, 113 S.Ct. at 863.

■ As the name suggests, the appropriate inquiry concerns actual or factual innocence, as compared to legal innocence. *See Steele,* 11 F.3d at 1522 n. 8. " '[D]emonstrating that an error is by its nature the kind of error that might have affected the accuracy of a death sentence is far from demonstrating that an individual defendant probably is "actually innocent" of the sentence he or she received.'" *Sawyer,* —— U.S. at ——, 112 S.Ct. at 2519 (quoting *Dugger v. Adams,* 489 U.S. 401, 412 n. 6, 109 S.Ct. 1211, 1218 n. 6, 103 L.Ed.2d 435 (1989)); *Steele,* 11 F.3d at 1522 & n. 8. As in the case of a petitioner who can demonstrate cause and prejudice to override a procedural default, a sufficient showing of actual innocence serves only to excuse a habeas petitioner's procedural default so a court may adjudicate the merits of the underlying claim. A claim of actual innocence, in other words, "is not itself a constitutional claim, but instead a gateway through

which a habeas petitioner must pass to have his otherwise barred constitutional claim *considered on the merits.*" *Herrera,* —— U.S. at ——, 113 S.Ct. at 862 (emphasis added); *see also Murray v. Carrier,* 477 U.S. at 496, 106 S.Ct. at 2649–50; *Steele,* 11 F.3d at 1522 & n. 8.

In the specific context of a sentencing challenge, the Supreme Court has held actual innocence requires the petitioner to show "by clear and convincing evidence that but for constitutional error, no reasonable juror would find him eligible for the death penalty under [state] law." *Sawyer,* —— U.S. at ——, 112 S.Ct. at 2523. Persuaded by the "eligibility" test of the Fifth and Eleventh Circuits, the Court held the correct focus is on "those elements which render a defendant eligible for the death penalty, and not on additional mitigating evidence which was prevented from being introduced as a result of a claimed constitutional error." *Id.*

Applying these teachings to this case, we conclude Mr. Brecheen has not shown how our failure to address the merits of this claim because of his procedural default will result in a miscarriage of justice. He has not demonstrated that the failure to give this mitigating instruction, which we assume was warranted, affected his "eligibility" to receive the death penalty under *Sawyer* and its progeny. The Supreme Court's adoption of the eligibility standard in *Sawyer* refutes the position that we should look to the presence or absence of particular mitigating circumstances such as the alleged failure to give a mitigating instruction. Therefore, we reject this allegation of error.

### B.

■ Mr. Brecheen next raises an Eighth Amendment challenge to Oklahoma's application of the "great risk of death" aggravating circumstance in regard to his sentence.[11] Because the Oklahoma Court of Criminal Appeals adjudicated this claim on the merits in Mr. Brecheen's direct appeal, it is not subject to a procedural bar, notwithstanding the Court of Criminal Appeals' decision not

---

11. Section 701.12(2) of the Oklahoma statutes provides that the phrase "aggravating circumstances" includes a finding that the "defendant

knowingly created a great risk of death to more than one person."

to rehear this claim on his application for postconviction relief. *See Ylst,* 501 U.S. at 804, 111 S.Ct. at 2595.

### 1.

■ Oklahoma's rule preventing relitigation in state postconviction proceedings of claims raised and decided on direct appeal does not constitute a procedural bar to federal habeas review. In *Ylst,* 501 U.S. 797, 111 S.Ct. 2590, the Supreme Court considered the effect of unexplained state court orders on an earlier reasoned state court order for purposes of federal habeas review. The Court noted that because a state court's subsequent unexplained order is "not meant to convey *anything* as to the reason for the decision," *id.* at 803, 111 S.Ct. at 2594 (emphasis in original), a "look through" rule that gives the later unexplained decision "*no* effect" most nearly reflects the role that such decisions are intended to play. *Id.* at 804, 111 S.Ct. at 2595 (emphasis in original) (footnote omitted). In practice, the look-through rule tells a federal habeas court to ignore the unexplained order and focus upon the last reasoned state court decision. *Id.* at 803, 111 S.Ct. at 2594; *Church,* 942 F.2d at 1507. In so doing, the federal habeas court places itself in a position to determine if the reasoning used in that state court opinion " 'fairly appear[s]' to rest primarily upon federal law,'" *Ylst,* 501 U.S. at 802, 111 S.Ct. at 2594 (quoting *Coleman,* 501 U.S. at 737, 111 S.Ct. at 2558), such that habeas review is proper, or if the state court decision rested on an adequate and independent state ground, *i.e.,* a procedural bar. *Ylst,* 501 U.S. at 802, 111 S.Ct. at 2594.

The presumption that subsequent unexplained orders should be given no effect is a relatively accurate barometer in most cases. *Id.* at 804, 111 S.Ct. at 2595 ("The maxim is that silence implies consent ... and courts generally behave accordingly, affirming without further discussion when they agree, not when they disagree, with the reasons given below."). As the Court noted in a footnote, however, the only recurring circumstance where this presumption is unrealistic is the situation presently before us, where

the later state decision rests upon a prohibition against *further* [emphasis in original] state review—for example, an unexplained denial of state habeas resting in fact upon a rule ... preventing the *relitigation on state habeas of claims raised on direct appeal.* In that circumstance, even though the presumption does not posit the real reason for the later denial, it does produce a result ('looking through' to the last reasoned decision) that is the correct one for federal habeas courts. *Since a later state decision based upon ineligibility for further state review [does not] rest[ ] upon [a] procedural default ... its effect upon the availability of federal habeas is nil—which is precisely the effect accorded by the 'look-through' presumption.*

*Id.* at 804 n. 3, 111 S.Ct. at 2595 n. 3 (emphasis added).

Thus, under the *Ylst* footnote, if a state court addresses the merits of a particular federal claim on direct appeal, as it did here with respect to Mr. Brecheen's Eighth Amendment claim, then its subsequent refusal to grant "further" state review in an application for postconviction relief should be given no effect and does not constitute a procedural bar for purposes of federal habeas corpus review. *Id.* at 803–04 & n. 3, 111 S.Ct. at 2594–95 & n. 3. Therefore, we are free to examine the merits of this aspect of Mr. Brecheen's Eighth Amendment challenge, which posits that the "great risk of death to others" aggravating circumstance is unconstitutional because it does not provide the sentencer with a rationally reviewable standard. Because we conclude that this aggravating circumstance is consistent with the dictates of the Supreme Court's interpretation of the Eighth Amendment, we reject this claim of error.

### 2.

■ In *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the various opinions of the Supreme Court established the principle that the Eighth Amendment imposes some limitations on the ability of the States to impose the punishment of death. This core tenet was adhered to in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909,

49 L.Ed.2d 859 (1976), where a plurality of the Court stated that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Id.* at 189, 96 S.Ct. at 2932 (opinion of Stewart, Powell, and Stevens, JJ.); *see also Lewis v. Jeffers,* 497 U.S. 764, 774, 110 S.Ct. 3092, 3098–99, 111 L.Ed.2d 606 (1990) (majority opinion). In *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), Justice Stewart's plurality opinion reiterated that "if a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty." *Id.* at 428, 100 S.Ct. at 1764 (plurality opinion); *Lewis,* 497 U.S. at 774, 110 S.Ct. at 3098–99; *Zant v. Stephens,* 462 U.S. 862, 874, 103 S.Ct. 2733, 2741, 77 L.Ed.2d 235 (1983) (quoting *Gregg,* 428 U.S. at 189, 96 S.Ct. at 2932–33).

To provide the necessary guidance to a capital sentencing jury, and thereby reduce the concerns relating to the potential for arbitrary application of the death penalty, those states that allow the imposition of this "qualitatively different" punishment have enacted comprehensive statutory schemes to regulate the circumstances under which it may be administered. *Cartwright v. Maynard,* 822 F.2d 1477, 1483 (10th Cir.1987) (en banc) (*Cartwright II* ), *aff'd,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988).

In some states, aggravating circumstances are simply a device for "narrow[ing] the class of first degree murderers that are eligible for the death penalty." *Id.* at 1480 (citing cases decided under Georgia, Utah, and Louisiana law where the courts use aggravating circumstances to determine which first degree murders are capital offenses). In other states, including Oklahoma, aggravating circumstances serve a "decidedly different" function. *Id.* As we stated in *Cartwright II:*

> An aggravating circumstance under the Oklahoma scheme does not establish a threshold that distinguishes capital murders from other first degree murders. In

Oklahoma *any* first degree murder is punishable by life imprisonment or death. Okla.Stat.Ann. tit. 21, § 701.9 (West. 1983).... Oklahoma uses an aggravating circumstance to guide the discretion of the sentencer in determining whether the death penalty should be imposed for a particular murder. Okla.Stat.Ann. tit. 21, § 701.10 (West 1983).

*Id.* (emphasis in original). In Oklahoma, aggravating factors perform a "crucial function in a capital punishment statute" by establishing standards that "channel the discretion of the sentencer" in its decision of whether the circumstances of a particular crime warrant imposition of the death penalty. *Id.* at 1485. These aggravating factors reflect a legislative determination of which extraordinary situations entailing "special indicia of blameworthiness or dangerousness in the killing," *id.,* "reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant,* 462 U.S. at 877, 103 S.Ct. at 2742. In essence, then, aggravating circumstances in Oklahoma "direct the sentencer's attention to a particular aspect of a killing that justifies the death penalty." *Cartwright II,* 822 F.2d at 1485.

Capital punishment issues under the Eighth Amendment may implicate concerns related to the eligibility decision, the selection decision, or both. *See Tuilaepa v. California,* — U.S. —, —, 114 S.Ct. 2630, 2634, 129 L.Ed.2d 750 (1994). The eligibility decision focuses on whether the individual has been convicted "of a crime for which the death penalty is a proportionate punishment." *Id.* (citing *Coker v. Georgia,* 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977)). Precedent establishes that death is a proportionate punishment in a homicide case as long as the trier of fact finds one constitutionally sufficient aggravating circumstance (or its equivalent) at either the guilt or the penalty phase. *Tuilaepa,* — U.S. at —, 114 S.Ct. at 2634 (citing *Lowenfield v. Phelps,* 484 U.S. 231, 244–46, 108 S.Ct. 546, 554–55, 98 L.Ed.2d 568 (1988); *Zant,* 462 U.S. at 878, 103 S.Ct. at 2743).

In contrast to the eligibility decision, the selection decision focuses on whether a

particular individual who is eligible for the death penalty should in fact receive that sentence or whether some lesser sentence is warranted. *See Tuilaepa,* — U.S. at —, 114 S.Ct. at 2635. "What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Zant,* 462 U.S. at 879, 103 S.Ct. at 2743–44 (emphasis in original), quoted in *Tuilaepa,* — U.S. at —, 114 S.Ct. at 2635. In order to satisfy this individualized determination requirement, the sentencer must be afforded the opportunity to "consider relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime." *Tuilaepa,* at —, 114 S.Ct. at 2635 (citing *Blystone v. Pennsylvania,* 494 U.S. 299, 307, 110 S.Ct. 1078, 1083–84, 108 L.Ed.2d 255 (1990)). In *Johnson v. Texas,* — U.S. —, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993), the Court stated that "[a]s long as the mitigating evidence is within 'the effective reach of the sentencer,' the requirements of the Eighth Amendment are satisfied." *Id.* at —, 113 S.Ct. at 2669 (quoting *Graham v. Collins,* — U.S. —, —, 113 S.Ct. 892, 901, 122 L.Ed.2d 260 (1993)).

The primary issue before us involves a determination of whether the jury's consideration of Oklahoma's "great risk of death to others" aggravating circumstance in making the eligibility decision contravened the Eighth Amendment. *Tuilaepa* holds that there are two criteria for determining whether a particular aggravating circumstance is constitutional. "First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder." *Tuilaepa,* — U.S. at —, 114 S.Ct. at 2635 (citing *Arave v. Creech,* — U.S. —, —, 113 S.Ct. 1534, 1542, 123 L.Ed.2d 188 (1993) ("If the sentencer fairly could conclude that an aggravating circumstance applies to *every* defendant eligible for the death penalty, the circumstance is constitutionally infirm." (Emphasis in original.)). "Second, the aggravating circumstance may not be unconstitutionally vague." *Tuilaepa,* — U.S. at —, 114 S.Ct. at 2635; *Walton v. Arizona,* 497 U.S. 639, 654, 110 S.Ct. 3047, 3057–58, 111 L.Ed.2d 511 (1990) (stating that the court must determine "whether the statutory language defining the circumstance is itself too vague to provide any guidance to the sentencer."). We must now measure Okla.Stat. tit. 21, § 701.12(2) against these requirements.

a.

We have no trouble concluding this aggravating circumstance comports with the "subclass" requirement. The aggravating factor that resulted in the imposition of the death penalty in this case applies if it is shown that the defendant "knowingly created a great risk of death to more than one person." Okla.Stat. tit. 21, § 701.12(2). This factor cannot reasonably be said to apply to every defendant convicted of murder, as in the case of Oklahoma's "especially heinous, atrocious, or cruel" aggravating circumstance, which we invalidated in *Cartwright II* and which was affirmed by the Supreme Court, or Georgia's "outrageously or wantonly vile, horrible or inhuman" circumstance invalidated in *Godfrey.* *See Walton,* 497 U.S. at 652–56, 110 S.Ct. at 3057 (discussing why these aggravating circumstances were invalid). · *But cf. Arave,* — U.S. at —, 113 S.Ct. at 1541–45 (upholding the constitutionality of Idaho's aggravating factor which requires proof that "the defendant exhibited utter disregard for human life."). In contrast to the aggravating circumstances at issue in *Cartwright* and *Godfrey,* the "great risk of death to others" factor applied in this case only applies to a defined and limited subclass of murderers, namely, those where the defendant's conduct not only resulted in murder, but also posed a significant risk of death to other individuals. Because this circumstance could not reasonably be interpreted as applying to every defendant convicted of murder, we find that it is properly limited to a particular subclass and is therefore constitutional under the Eighth Amendment, as interpreted in *Tuilaepa* and *Arave.*

b.

■ With respect to the vagueness component of the inquiry, we find Mr. Brecheen's argument fails to note that the panel's deci-

sion in *Cartwright*, which is still valid precedent after en banc review,[12] *see Cartwright II*, 822 F.2d at 1478 n. 2, rejected the precise claim of vagueness advanced here with respect to this specific aggravating circumstance. *See Cartwright v. Maynard*, 802 F.2d 1203, 1221–22 (10th Cir.1986) (*Cartwright I*) (citing, *inter alia*, *Proffitt v. Florida*, 428 U.S. 242, 256, 96 S.Ct. 2960, 2968, 49 L.Ed.2d 913 (1976) (upholding the Florida courts' construction of a similarly worded aggravating factor)). Reviewing Oklahoma case law prior to 1986, we found the construction of the "great risk" factor by Oklahoma courts provided consistent guidance to the jury so as to limit its discretion and thereby withstand an Eighth Amendment challenge. *See Cartwright I*, 802 F.2d at 1222. We find no deviation from this conclusion since that time. *See, e.g., Snow v. State*, 876 P.2d 291 (Okla.Crim.App.1994); *Ellis v. State*, 867 P.2d 1289 (Okla.Crim.App.1992), *cert. denied*, —— U.S. ——, 115 S.Ct. 178, 130 L.Ed.2d 113 (1994); *Trice v. State*, 853 P.2d 203 (Okla.Crim.App.), *cert. denied*, —— U.S. ——, 114 S.Ct. 638, 126 L.Ed.2d 597 (1993); *Nguyen v. State*, 769 P.2d 167 (Okla.Crim. App.1988), *cert. denied*, 492 U.S. 925, 109 S.Ct. 3264, 106 L.Ed.2d 609 (1989). The construction given to this circumstance by

the Oklahoma courts does not require the death of more than one person. It only requires an act or acts by the defendant that create the risk of death to another who is in close proximity to the killing itself in terms of time, location, and intent. *Snow*, 876 P.2d at 297.

In this case, the jury found Mr. Brecheen killed Mrs. Stubbs, fired a gun several times into the empty bed of Mr. Stubbs, and then returned fire into the Stubbses' residence as he fled. The sentencer's ultimate conclusion that this conduct constitutes a "great risk of danger to more than one person" is entirely consistent with both the facts of this case and the Oklahoma courts' construction of this factor. Because "our vagueness review is quite deferential," *Tuilaepa*, —— U.S. at ——, 114 S.Ct. at 2635, and because this factor "has some 'common-sense core of meaning . . . that criminal juries should be capable of understanding,'" *Tuilaepa*, —— U.S. at ——, 114 S.Ct. at 2636 (quoting with approval *Jurek v. Texas*, 428 U.S. 262, 279, 96 S.Ct. 2950, 2959–60, 49 L.Ed.2d 929 (1976) (White, J., concurring in judgment)), we find that this aggravating factor is not unconstitutionally vague.[13]

**12.** En banc review, and ultimately certiorari, were granted in *Cartwright II* to decide whether a separate aggravating circumstance not implicated in this case, § 701.12(4), which allowed the imposition of a death sentence for a crime found to be "especially heinous, atrocious, or cruel," was unconstitutionally vague and overbroad in violation of the Eighth Amendment. Our unanimous en banc decision finding this aggravating factor unconstitutional, and the Supreme Court's subsequent affirmance, did not address the aggravating factor at issue in this case, which implicates § 701.12(2). *See Maynard v. Cartwright*, 486 U.S. 356, 360, 108 S.Ct. 1853, 1857, 100 L.Ed.2d 372 (1988), *aff'g*, 822 F.2d 1477, 1492 (10th Cir.1987), *rev'g on other grounds, Coleman v. Brown*, 802 F.2d at 1219–21.

**13.** Although Mr. Brecheen does not assert a claim regarding the constitutionality of the selection decision, we find that because there is some degree of overlap between this type of claim and his claim that he received ineffective assistance of counsel at sentencing, it is appropriate to address this issue.

The Supreme Court has held that the selection decision, which requires an individualized sentencing determination, "is met when the jury can

consider relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime." *Tuilaepa*, —— U.S. at ——, 114 S.Ct. at 2635 (citing *Blystone*, 494 U.S. at 307, 110 S.Ct. at 1083–84); *see also Johnson v. Texas*, —— U.S. at ——, 113 S.Ct. at 2669. Although Mr. Brecheen asserts he received ineffective assistance of trial counsel at the sentencing phase, based on counsel's failure to introduce *additional* mitigating evidence, the record is clear that the mitigating evidence adduced during the guilt phase was incorporated into the sentencing phase. Therefore, the sentencing jury was in fact allowed to "consider relevant mitigating evidence."

*Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Green v. Georgia*, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979) (per curiam); *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion); *Roberts v. Louisiana*, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976) (plurality opinion); *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality opinion); and *Dutton v. Brown*, 812 F.2d 593 (10th Cir.) (en banc), *cert. denied*, 484 U.S. 870, 108 S.Ct. 197, 98 L.Ed.2d 149 (1987), are not to the contrary.

## IV. Ineffective Assistance of Counsel

Mr. Brecheen's final assignment of error is a claim he received ineffective assistance of trial counsel at the sentencing phase of his trial. The procedural posture of this claim requires some elaboration.

Mr. Brecheen did not raise this claim on his direct appeal. In his application for post-conviction relief, Mr. Brecheen, with new counsel, raised this issue before the state district court. The state court granted an evidentiary hearing in which Mr. Brecheen offered expert testimony evaluating trial counsel's sentencing phase conduct. The state district court ultimately concluded on the merits that there was no Sixth Amendment violation. On postconviction review, however, the Oklahoma Court of Criminal Appeals did not resolve this issue on the merits. Instead, it concluded this issue was *res judicata* under § 1086 because it was "not raised during the direct appeal, notwithstanding similar allegations with respect to the first stage proceedings. No compelling explanation for the late raising is offered." *Brecheen II*, 835 P.2d at 119 n. 1.

In reviewing Mr. Brecheen's federal habeas petition, the district court found the ineffective assistance claim procedurally barred, but, out of an "overabundance of caution," that court considered and dismissed the issue on the merits. No. CIV–94–318–S, slip op. at 12–18. On appeal, Mr. Brecheen argues the federal district court erred in failing to grant him a separate evidentiary hearing on this issue, in finding this claim procedurally barred and in dismissing it on the merits. We address these claims in turn.

### A.

■ We agree with the district court that Mr. Brecheen was not entitled to an additional evidentiary hearing in federal court because he received a full and fair hearing in state court. *See Jeffries v. Blodgett*, 5 F.3d 1180, 1188 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1294 (1994).

■ In *Parks v. Brown*, 840 F.2d 1496 (10th Cir.1987), we stated there is no absolute right to an evidentiary hearing "in every case involving a claim of ineffectiveness of counsel." *Id.* at 1509. Rather, the determination of whether an evidentiary hearing is mandated involves application of a two-pronged test. First, the petitioner bears the burden of "alleg[ing] facts which, if proved, would entitle him to relief." *Townsend v. Sain*, 372 U.S. 293, 312, 83 S.Ct. 745, 757, 9 L.Ed.2d 770 (1963);[14] *Lucero v. Kerby*, 7 F.3d 1520, 1522 (10th Cir.1993). If the petitioner carries this burden, then an evidentia-

---

Those cases all involved situations where the sentencer was, for a variety of reasons, prevented or precluded from considering relevant mitigating evidence. For example, *Woodson* and *Roberts* involved state statutes that excluded all mitigating evidence from the sentencer's consideration; *Lockett* and *Green* involved state statutes that limited the type of mitigating evidence that could be introduced; *Eddings* involved a trial judge's erroneous interpretation of existing precedent which he believed prohibited him from considering certain types of mitigating evidence; and *Skipper* and *Dutton* involved a trial court's affirmative act of excluding relevant mitigating evidence that the defendant wished to offer. In the present case, however, there is no evidence in the record that state law or the trial court "excluded" evidence that the defendant wished to offer from the sentencer's consideration, in contravention of the cases described above; rather, the evidence supports a finding that Mr. Brecheen and his trial counsel made a tactical decision to *forego* the introduction of additional mitigating evidence. Because *Lockett* and its progeny stand only for the proposition that a State may not, by statute or judicial act, "cut off in an

absolute manner the presentation of mitigating evidence," *McKoy v. North Carolina*, 494 U.S. 433, 456, 110 S.Ct. 1227, 1240, 108 L.Ed.2d 369 (1990) (Kennedy, J., concurring), quoted in *Johnson*, —— U.S. at ——, 113 S.Ct. at 2666 (majority opinion), we find that entire line of authority inapposite to the case before us.

Therefore, while we conclude there was no Eighth Amendment violation in regard to the selection decision, we discuss below whether there was a Sixth Amendment violation of the right to effective assistance of counsel at sentencing in regard to the decision not to introduce additional mitigating evidence.

**14.** We note that *Townsend v. Sain* is still valid precedent except to the extent it applies the "deliberate bypass" or "knowing waiver" standard, as opposed to the cause and prejudice and fundamental miscarriage of justice standards, to establish an excuse for a habeas petitioner's failure to develop a material fact in state court proceedings. *See Keeney v. Tamayo-Reyes*, —— U.S. ——, ——, 112 S.Ct. 1715, 1719, 118 L.Ed.2d 318 (1992) (overruling in part *Townsend*, 372 U.S. at 317, 83 S.Ct. at 759).

ry hearing is required " 'if the habeas applicant did not receive a full and fair evidentiary hearing in the state court, either at the time of the trial *or in a collateral proceeding.*' " *Church,* 942 F.2d at 1510 (emphasis added) (quoting *Townsend,* 372 U.S. at 312, 83 S.Ct. at 756–57); *see also Keeney,* —— U.S. at ——, 112 S.Ct. at 1720. The "full and fair" hearing exception is especially applicable if "a state court has made findings as to those very facts." *Meeks v. Singletary,* 963 F.2d 316, 319 (11th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1362, 122 L.Ed.2d 741 (1993). Because Mr. Brecheen has not alleged any specific facts that would entitle him to relief other than the facts adduced at the state court hearing, and because we believe the hearing afforded Mr. Brecheen a full and fair hearing at the state level, we agree with the district court's conclusion not to grant an evidentiary hearing.

During the state court evidentiary hearing, current counsel for Mr. Brecheen presented testimony of the attorney who handled the trial in this case, along with the testimony of several potential mitigating witnesses and the investigator hired by current counsel to locate mitigating affiants. Mr. Brecheen testified as well in his own behalf. Furthermore, the state court admitted the deposition testimony of an expert witness who evaluated trial counsel's performance and admitted the affidavits of several persons who supported Mr. Brecheen. Under these circumstances, and accounting for the fact that a state court's findings of fact are entitled to a presumption of correctness,[15] and in the absence of any evidence to the contrary, we believe Mr. Brecheen received a full and fair postconviction evidentiary hearing on the question of ineffective assistance of counsel in state district court. Therefore, the district court's conclusion that another evidentiary hearing was not necessary was correct.

### B.

■ Mr. Brecheen next claims the district court erred in finding this claim proce-durally barred. The district court concluded that the Court of Criminal Appeals' decision rejecting Mr. Brecheen's postconviction appeal of this claim rested on his failure to raise it on direct appeal, which the district court viewed as an adequate and independent state ground to support the decision. Although we conclude the Court of Criminal Appeals' decision rested on a state law ground "independent" of federal law (*i.e.,* waiver), we do not believe in this case Oklahoma's application of this procedural rule was an "adequate" state ground. Therefore, we agree with Mr. Brecheen that his claim is not procedurally barred.

■ The general rule is the failure to raise a claim at trial or on direct appeal will preclude federal habeas corpus review of the merits of the claim absent a showing of either cause and prejudice or a fundamental miscarriage of justice. *See Andrews,* 943 F.2d at 1188; *Osborn v. Shillinger,* 861 F.2d 612, 622 (10th Cir.1988). When, however, the underlying claim is ineffective assistance of counsel, then our cases indicate the "general" rule must give way because of countervailing concerns unique to ineffective assistance claims. In *Osborn,* we quoted the following passage from *Kimmelman v. Morrison,* 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986):

"Because collateral review will frequently be the only means through which an accused can effectuate the right to counsel, restricting the litigation of some Sixth Amendment [ineffective assistance of counsel] claims to trial and direct review would seriously interfere with an accused's right to effective representation."

*Osborn,* 861 F.2d at 622 (quoting *Kimmelman,* 477 U.S. at 378, 106 S.Ct. at 2584–85). This need to give a meaningful opportunity to assess and develop a claim of ineffective assistance of counsel, coupled with the fact that such claims may require an opportunity

---

15. "Explicit and implicit findings by state trial and appellate courts 'shall be presumed to be correct,' 28 U.S.C. § 2254(d), unless one of seven factors listed in section 2254(d) are present, or the federal court concludes that the state court findings are not fairly supported by the record."

*Case v. Mondragon,* 887 F.2d 1388, 1392 (10th Cir.1989), *cert. denied,* 494 U.S. 1035, 110 S.Ct. 1490, 108 L.Ed.2d 626 (1990) (citations omitted); *see also Marshall v. Lonberger,* 459 U.S. 422, 431–32, 103 S.Ct. 843, 849–50, 74 L.Ed.2d 646 (1983).

to develop additional facts,[16] compel the conclusion that "ineffective assistance claims may be brought for the first time collaterally." *Osborn,* 861 F.2d at 622; *accord Andrews,* 943 F.2d at 1192–93. *Osborn* indicates that this result is dictated by the interplay of two factors: the need for additional fact-finding, along with the need to permit the petitioner to consult with separate counsel on appeal in order to obtain an objective assessment as to trial counsel's performance. *Osborn,* 861 F.2d at 623.

Although Mr. Brecheen was represented by separate counsel on his direct appeal, a fact distinguishing this case from *Osborn,* he nonetheless did not have an opportunity to develop any additional facts relating to trial counsel's performance in the direct review process since evidentiary hearings are unavailable at the appellate level. He was, however, given this opportunity when he filed his postconviction petition, and his claim was ultimately denied on the merits after a hearing. Yet on appeal, the Court of Criminal Appeals refused to review this claim on the merits, even after a hearing had taken place, because it concluded the claim was waived for not having been raised on direct appeal. *See Brecheen II,* 835 P.2d at 119 n. 1. While this determination provides an "independent" state law ground for rejecting this claim, we do not believe it is an adequate basis. The practical effect of this ruling is to force Mr. Brecheen either to raise this claim on direct appeal, with new counsel but *without the benefit of additional fact-finding,* or have the claim forfeited under state law. This Hobson's choice cannot constitute an adequate state ground under the controlling case law because it deprives Mr. Brecheen of any meaningful review of his ineffective assistance claim. What *Osborn* and its progeny give Mr. Brecheen—the opportunity to raise this claim on collateral review—the Court of Criminal Appeals effectively takes away by finding the claim waived. Therefore, we do not find this claim procedurally barred, and accordingly, we turn to the merits to determine whether trial counsel was ineffective.

## C.

The primary thrust of Mr. Brecheen's ineffectiveness argument is that defense counsel failed to present additional mitigating evidence during the sentencing phase of his trial. Trial counsel's ineffectiveness purportedly stemmed from his lack of investigation and preparation as to the available mitigating evidence. To demonstrate this lack of investigation, Mr. Brecheen, in his attempt to obtain postconviction relief, filed numerous affidavits from family, friends, and coworkers who contend they would have appeared to testify on his behalf had they been called. After the state district court held an evidentiary hearing on this issue, it concluded that:

> Time and hindsight aid the defendant and current counsel in scrutinizing the conduct of trial counsel. However, when viewed in the context of the then existing circumstances, the Court is not convinced that conduct falls below the standard set by *Strickland v. Washington,* 466 U.S. [668] 688, 104 S.Ct. [2052] 2053, 80 L.Ed.2d 674 (1984). In so deciding as the trier of fact at the *evidentiary hearing,* the Court finds the defendant discussed with his attorney his option regarding mitigating evidence and made a voluntary decision to forego the opportunity to call witnesses. However, this is but one of the factors which causes the Court to determine the defendant was adequately represented.

Order of Feb. 10, 1989, No. CRF–83–127, slip op. at 1–2 (20th Judicial District, Oklahoma).

The district court agreed with the state court's conclusion. The district court first concluded that Mr. Brecheen introduced *some* mitigating evidence during the sentencing phase, namely, the guilt phase mitigating evidence that was incorporated into the sentencing phase. The district court then found that trial counsel's decision to limit the amount of mitigating evidence to be introduced at the sentencing phase was a reasonable tactical decision, especially in light of Mr. Brecheen's request that counsel forego the introduction of additional mitigating evi-

---

16. *See, e.g., Osborn,* 861 F.2d at 623; *Beaulieu v. United States,* 930 F.2d 805, 807 (10th Cir.1991) (noting the need when the record is insufficient for additional fact-finding on ineffective assistance of counsel claims in the context of § 2255 claim).

dence. We address the district court's conclusion after first enunciating the legal standards that govern our review of this issue.

### 1.

The Sixth Amendment to the Constitution provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. "The Supreme Court has long 'recognized that "the right to counsel is the right to *effective assistance* of counsel" ' under the Sixth Amendment." *Osborn,* 861 F.2d at 624 (emphasis added) (quoting *Strickland,* 466 U.S. at 686, 104 S.Ct. at 2063–64); *accord Dutton v. Brown,* 812 F.2d 593, 597 (10th Cir.1987). This right extends to a capital sentencing hearing. *Harris v. Dugger,* 874 F.2d 756, 762 (11th Cir.), *cert. denied,* 493 U.S. 1011, 110 S.Ct. 573, 107 L.Ed.2d 568 (1989).

To prevail on a Sixth Amendment claim of actual [17] ineffective assistance of counsel under the Sixth Amendment, Mr. Brecheen must first show that counsel "committed serious errors in light of 'prevailing professional norms' " in that the representation fell below an objective standard of reasonableness. *See Strickland,* 466 U.S. at 688, 104 S.Ct. at 2064–65; *Haddock,* 12 F.3d 950, 955 (10th Cir.1993). In so doing, the petitioner must overcome the "strong presumption" that counsel's conduct falls within the "wide range of reasonable professional assistance" that " 'might be considered sound trial strategy,' " *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065 (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955)); he must, in other words, overcome the presumption that counsel's conduct was constitutionally effective. *Haddock,* 12 F.3d at 955. A claim of ineffective assistance "must be reviewed from the perspective of counsel at the time," *Porter v. Singletary,* 14 F.3d 554, 558 (11th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 532, 130

L.Ed.2d 435 (1994), and therefore may not be predicated on " 'the distorting effects of hindsight.' " *Parks,* 840 F.2d at 1510 (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065). Finally, in reviewing ineffective assistance claims, we "address not what is prudent or appropriate, but only what is constitutionally compelled." *Cronic,* 466 U.S. at 665 n. 38, 104 S.Ct. at 2050 n. 38, cited with approval in *Burger v. Kemp,* 483 U.S. 776, 794, 107 S.Ct. 3114, 3125–26, 97 L.Ed.2d 638 (1987).

If constitutionally deficient performance is shown, then Mr. Brecheen must demonstrate that "there is a 'reasonable probability' that the outcome would have been different had those errors not occurred." *Haddock,* 12 F.3d at 955 (citing *Strickland,* 466 U.S. at 688, 694, 104 S.Ct. at 2064–65, 2068; *Lockhart v. Fretwell,* — U.S. —, —, 113 S.Ct. 838, 842–43, 122 L.Ed.2d 180 (1993)). In the specific context of a challenge to a death sentence, the prejudice component of *Strickland* focuses on whether "the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2069, quoted in *Stevens v. Zant,* 968 F.2d 1076, 1081 (11th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 1306, 122 L.Ed.2d 695 (1993). The petitioner carries the burden of establishing both that the purported deficiencies unreasonably fell beneath prevailing norms of professional conduct and that the deficient performance prejudiced his defense. *Strickland,* 466 U.S. at 686, 104 S.Ct. at 2063–64; *Yarrington,* 992 F.2d at 1079. In essence, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland,* 466 U.S. at 686, 104 S.Ct. at 2064.

"[T]he performance and prejudice prongs under *Strickland* involve mixed

---

**17.** Mr. Brecheen's ineffective assistance of counsel claim does not allege "presumed" ineffectiveness of counsel, which exists in such contexts as an actual conflict of interest, *see Holloway v. Arkansas,* 435 U.S. 475, 484, 98 S.Ct. 1173, 1178, 55 L.Ed.2d 426 (1978), or the total absence of counsel during a critical stage of the proceedings, *see United States v. Cronic,* 466 U.S. 648, 659 n. 25, 104 S.Ct. 2039, 2047 n. 25, 80 L.Ed.2d 657 (1984). For clarity, we therefore refer to his claim as one alleging "actual" ineffective assistance of counsel.

questions of law and fact which we review *de novo.*" *United States v. Owens,* 882 F.2d 1493, 1501–02 n. 16 (10th Cir.1989), quoted in *United States v. Whalen,* 976 F.2d 1346, 1347 (10th Cir.1992); *see also Haddock,* 12 F.3d at 955; *United States v. Miller,* 907 F.2d 994, 997 (10th Cir.1990); *Porter,* 14 F.3d at 558. Accordingly, "in a federal habeas challenge to a state criminal judgment, a state court conclusion that counsel rendered effective assistance is not a finding of fact binding on the federal court to the extent stated by 28 U.S.C. § 2254(d)." *Strickland,* 466 U.S. at 698, 104 S.Ct. at 2070, quoted in *Bolender v. Singletary,* 16 F.3d 1547, 1558 n. 12 (11th Cir.1994), *cert. denied,* — U.S. ——, 115 S.Ct. 589, 130 L.Ed.2d 502 (1994); *Miller,* 907 F.2d at 997 (quoting *Wycoff v. Nix,* 869 F.2d 1111, 1117 (8th Cir.), *cert. denied,* 493 U.S. 863, 110 S.Ct. 179, 107 L.Ed.2d 135 (1989)). The state court's findings of historical fact, however, are entitled to the presumption of correctness. *Miller,* 907 F.2d at 997; *Bolender,* 16 F.3d at 1558 n. 12. The federal district court's findings of fact are subject to review only for clear error. *See Haddock,* 12 F.3d at 955; *Miller,* 907 F.2d at 996; *cf. Whalen,* 976 F.2d at 1347 (clear error standard applies to district court's findings of fact in a § 2255 action).

### 2.

#### a.

■ The gravamen of Mr. Brecheen's argument on the merits is that trial counsel's performance during the sentencing phase was ineffective due to his lack of preparation and inadequate investigation of possible mitigating circumstances.[18]

■ In the context of the sentencing phase of a capital case, we agree with our sister circuits and emphasize that "[a]n attorney has a *duty* to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence." *Middleton v. Dugger,* 849 F.2d 491, 493 (11th Cir.1988) (emphasis added) (citing *Thompson v. Wainwright,* 787 F.2d 1447, 1451 (11th Cir.1986), *cert. denied,* 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d 825 (1987)); *accord Sanders v. Ratelle,* 21 F.3d 1446, 1456 (9th Cir.1994); *Porter,* 14 F.3d at 557; *Lightbourne v. Dugger,* 829 F.2d 1012, 1025 (11th Cir.1987), *cert. denied,* 488 U.S. 934, 109 S.Ct. 329, 102 L.Ed.2d 346 (1988). Because of the existence of this duty, we also agree that "[t]he failure to conduct a reasonable investigation into possible mitigating circumstances" may "fall outside the scope of reasonable professional assistance," *Bolender,* 16 F.3d at 1557; *Lightbourne,* 829 F.2d at 1025; *see also Sanders,* 21 F.3d at 1456, and thereby amount to deficient representation under the first prong of *Strickland.*[19] In stating that an attorney has an affirmative duty to conduct an investigation into the existence of potential mitigating evidence, we do not imply that this duty is boundless. To the contrary, an attorney "is not required to investigate all leads" as long as the decision not to pursue a particular lead, or to pursue a particular lead only so far, is reasonable under the circumstances. *See Bolender,* 16 F.3d at 1557 & n. 11 (citing cases); *Harris,* 874 F.2d at 763 (citing *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066–67).

---

18. Mr. Brecheen also asserts in his supplemental brief that his alleged waiver of the right to present additional mitigating evidence was invalid because it was not made knowingly, intelligently and voluntarily. For reasons enunciated below, we do not believe that this subissue relating to the validity *vel non* of the purported waiver is appropriate to our analysis.

19. *Bolender* states that the failure to conduct a reasonable investigation may render counsel's assistance "ineffective." *Bolender,* 16 F.3d at 1557. *Bolender,* however, relies on *Lightbourne,* an earlier Eleventh Circuit decision, for this proposition. In fact, *Lightbourne* states that the failure to investigate may constitute deficient representation (*i.e.,* the first prong of *Strickland* ) and not necessarily proof of ineffectiveness (*i.e.,* the first and second prongs of *Strickland* ).

In our view, the statement from *Lightbourne* appears more consonant with *Strickland* in that inadequate investigation, inadequate preparation, or both, should not, *ipso facto,* mean that counsel was "ineffective" absent a showing of prejudice. Therefore, we believe, as in *Lightbourne,* that under such circumstances, petitioner still retains the burden of establishing that he was prejudiced as a result of counsel's failure to conduct a reasonable investigation. *See Sanders,* 21 F.3d at 1457 ("the failure to conduct a reasonable investigation constitutes deficient performance.").

In this case, we are unpersuaded by Mr. Brecheen's argument that his trial counsel inadequately prepared and investigated for the sentencing phase of trial. Our review of the evidentiary hearing and the entire record in this case supports the findings of the district court that trial counsel did in fact prepare and present some mitigating evidence at the sentencing phase. Mr. Brecheen's trial counsel, as part of general preparation for the trial, directed an investigation of Mr. Brecheen and his family. Counsel was aware of Mr. Brecheen's background, which he shared with the jury during the guilt phase and which was necessarily incorporated into the sentencing phase. That evidence included testimony that Mr. Brecheen had moved back home to assist his family when his father became ill; that he was a high school graduate with two years of training as a carpenter; that he was one of nine children in a large, church-going family; and that he had held a supervisory position in an oil field job. There was also evidence presented from his mother that he was a polite individual, and evidence from his fiancee that she still intended to marry Mr. Brecheen regardless of what happened. During his closing argument at the sentencing phase, trial counsel reiterated most, if not all, of this evidence along with additional mitigating circumstances. Moreover, review of the affidavits submitted by Mr. Brecheen's current counsel show trial counsel talked with other family members about testifying as character witnesses, but that he chose not to pursue that course of action for fear of risking a stronger response from the government.[20]

We do not believe that trial counsel's preparatory action in this case constituted inadequate investigatory work under *Strickland.* Leads were discovered and reasonably followed by counsel, and mitigating evidence was both presented and prepared to be presented. Tactical considerations, such as the effect of cross-examination on the credibility of the proposed witnesses, were also taken into account. Although others may choose to do differently, that is not the standard of our review. Moreover, recognizing the fact-specific nature of this inquiry, we believe our conclusion that trial counsel was not ineffective here is entirely consistent with our precedents holding that trial counsel was inadequate based on his or her complete lack of investigative efforts. *See Stafford v. Saffle,* 34 F.3d 1557 (10th Cir.1994) (finding that counsel's failure to conduct any investigation for possible mitigating evidence amounted to deficient conduct); *Osborn,* 861 F.2d at 626–27 (finding counsel's lack of preparation constituted deficient conduct); *see also Sanders,* 21 F.3d at 1456–57 (citing Ninth Circuit cases); *Bolender,* 16 F.3d at 1558 & 1559–60 n. 16 (citing Eleventh Circuit decisions); *Brewer v. Aiken,* 935 F.2d 850, 857–59 (7th Cir.1991). *See generally Blake v. Kemp,* 758 F.2d 523, 533 (11th Cir.) ("It should be beyond cavil that an attorney who fails altogether to make any preparations for the penalty phase of a capital murder trial deprives his client of reasonably effective assistance of counsel by any objective standard of reasonableness."), *cert. denied,* 474 U.S. 998, 106 S.Ct. 374, 88 L.Ed.2d 367 (1985).

We therefore conclude the district court's findings of adequate investigation and preparation are adequately supported by the state court record. Therefore, Mr. Brecheen's ineffective assistance of counsel claim on this point must fail.

b.

▮ Mr. Brecheen next asserts that even if trial counsel discharged his duty to investigate, he was still ineffective for failing to introduce this additional mitigating evidence, notwithstanding Mr. Brecheen's request that counsel forego the introduction of that mitigating evidence. Because we conclude the decision not to introduce additional mitigat-

20. Current counsel has diligently sought to show, through sheer volume of affidavits, the extent of mitigating witnesses undiscovered by trial counsel. We believe the affiants are well-intentioned in their support of Mr. Brecheen's moral character, but we find the great percentage of the affidavits to be cumulative and therefore offer little indication of trial counsel's ineffectiveness.

*See Devier v. Zant,* 3 F.3d 1445, 1452 (11th Cir. 1993) (failure to call for cumulative mitigating testimony during sentencing phase is no evidence of inadequate preparation); *Mathenia v. Delo,* 975 F.2d 444, 448 (8th Cir.1992) (same), *cert. denied,* —— U.S. ——, 113 S.Ct. 1609, 123 L.Ed.2d 170 (1993).

ing evidence was a reasonable tactical choice on the part of Mr. Brecheen's trial counsel, we reject this claim of error.

■ We agree with the Fifth and Eleventh Circuits that " '[c]ounsel has no absolute duty to present mitigating character evidence' at all." *Bolender*, 16 F.3d at 1557 (citing *Mitchell v. Kemp*, 762 F.2d 886, 889 (11th Cir.1985), *cert. denied*, 483 U.S. 1026, 107 S.Ct. 3248, 97 L.Ed.2d 774 (1987)); *Devier*, 3 F.3d at 1453. From this, it follows *a fortiori* that the failure to present available mitigating evidence is not *per se* ineffective assistance of counsel. *Bolender*, 16 F.3d at 1557; *King v. Puckett*, 1 F.3d 280, 284 (5th Cir.1993).

■ If counsel has mitigating evidence available but elects not to present that evidence, then the inquiry must focus on the reason or reasons for the decision not to introduce that evidence. If counsel had "a reasonable basis for his strategic decision that an explanation of petitioner's history would not have minimized the risk of the death penalty," *Burger*, 483 U.S. at 795, 107 S.Ct. at 3126, quoted in *Devier*, 3 F.3d at 1453, then that decision must be given "a strong presumption of correctness" and "the inquiry is generally at an end." *Porter*, 14 F.3d at 557; *see also Laws v. Armontrout*, 863 F.2d 1377, 1385 (8th Cir.1988) (en banc), *cert. denied*, 490 U.S. 1040, 109 S.Ct. 1944, 104 L.Ed.2d 415 (1989). If, however, the decision is not tactical, and counsel's performance is therefore deficient, then the first prong of *Strickland* is satisfied. The court must then engage in a "harmlessness review," *Middleton*, 849 F.2d at 493, to determine whether petitioner carried his burden of demonstrating that he was prejudiced by the deficient performance. *Porter*, 14 F.3d at 557; *Middleton*, 849 F.2d at 493.

We digress momentarily to explain why we believe Mr. Brecheen's argument that his purported waiver of his right to present mitigating evidence was not made knowingly, intelligently and voluntarily is misdirected.

The "knowing, intelligent and voluntary" standard for a waiver, which is traceable to *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), applies to a defined and limited class of issues that, because of their stature as "fundamental" decisions, are waivable only by the defendant. *See United States v. Teague*, 953 F.2d 1525, 1531 (11th Cir.) (en banc), *cert. denied*, — U.S. —, 113 S.Ct. 127, 121 L.Ed.2d 82 (1992). In *Teague*, the Eleventh Circuit noted the dichotomy between "fundamental" rights, such as the right to plead guilty, *see Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969),[21] the right to a jury trial, *see Adams v. United States ex rel. McCann*, 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268 (1942), the right to pursue an appeal, *see Fay v. Noia*, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), and other trial rights that "primarily involve trial strategy and tactics," including the decision as to "what evidence should be introduced." *Teague*, 953 F.2d at 1531. Having thus established this dichotomy, the Eleventh Circuit stated that fundamental rights are waivable only by the defendant because of the personal nature and importance of the right. *Id.* In contrast, however, the court expressly found that nonfundamental trial rights, including evidentiary matters, "are waivable by defense counsel on the defendant's behalf." *Id.*

■ Thus, although the narrow legal issue in *Teague*, whether the right to testify recognized in *Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) was a fundamental right, is not on point, the reasoning employed in *Teague* is clearly relevant to Mr. Brecheen's waiver argument in this case. In short, the question as to the propriety of introducing additional mitigating evidence in this case is not a fundamental right subject to the *Zerbst* waiver standard, but rather, fits squarely into the category of rights that are nonfundamental and that are not reviewed for compliance with the heightened waiver standard.[22] Therefore, while

**21.** *See also Parke v. Raley*, — U.S. —, —, 113 S.Ct. 517, 523, 121 L.Ed.2d 391 (1992).

**22.** In *Singleton v. Lockhart*, 962 F.2d 1315 (8th Cir.1992), the Eighth Circuit seemingly endorsed

the application of the heightened waiver standard under similar circumstances. 962 F.2d at 1321. To the extent that our conclusion is inconsistent with the Eighth Circuit's decision in *Singleton*, we respectfully disagree with its conclu-

trial counsel still retains an obligation to discuss this type of strategic matter with the client, given the client's right to assist in his own defense, see *Godinez v. Moran*, —— U.S. ——, ——, 113 S.Ct. 2680, 2686, 125 L.Ed.2d 321 (1993), we think the ultimate decision whether to introduce this type of evidence is vested in trial counsel. *E.g., Bolender*, 16 F.3d at 1557 ("'A *lawyer's election* not to present mitigating evidence is a tactical choice.'" (Citation omitted and emphasis added)). No claim has been advanced in this case that trial counsel did not consult with Mr. Brecheen before making this decision. Therefore, as long as counsel's decision is reasonable, it is not the prerogative of the federal courts to second-guess it.

■ As we have stated, then, the relevant inquiry is whether trial counsel's decision was an informed tactical decision that was reasonable under the circumstances of the case. Having delineated the appropriate legal framework, "it is important to note that 'the mere incantation of "strategy" does not insulate attorney behavior from review; an attorney must have chosen not to present mitigating evidence after having investigated the defendant's background, and that choice must have been *reasonable* under the circumstances.'" *Bolender*, 16 F.3d at 1558 (quoting *Stevens*, 968 F.2d at 1083) (emphasis in original).

Applying these principles to the case at bar, we find counsel's actions were in fact based on reasonable investigative efforts and that the decision constituted a reasonable tactical choice under the circumstances. The sequence of events relating to the sentencing proceedings is as follows. After the jury returned its verdict of guilty at the first phase of the trial, the sentencing proceedings were to begin in the evening after a long day of testimony in which the jury had heard from Mr. Brecheen and his mother. As the jury returned its guilty verdict, trial counsel observed several jurors were extremely upset and agitated. Rather than seek to postpone sentencing deliberations into the next days, trial counsel believed those jurors who did not feel strongly about the guilty verdict

might refuse to vote unanimously for the death penalty if asked to deliberate as soon as possible. Trial counsel also testified that, at that time, his strategy was to first present the defendant, then the defendant's sisters followed by his fiancee. Because some contradictory testimony had been elicited earlier among Mr. Brecheen, his mother, and his fiancee, trial counsel was concerned about further impeachment of the potential witnesses.

Just prior to the sentencing phase, defense counsel told the trial judge that Mr. Brecheen, having been informed of his right to present mitigating testimony, did not wish to delay the proceeding by putting on additional evidence. The trial court instructed the jury, in Mr. Brecheen's presence, to consider evidence relative to mitigation that was presented on the defendant's behalf during the guilt phase of trial because the defendant did not wish to present any further evidence.

While it might have been preferable for the state trial court to interview Mr. Brecheen prior to the sentencing phase, as was suggested by trial counsel, the evidence adduced during the state postconviction evidentiary hearing shows both trial counsel and Mr. Brecheen were given full opportunity to explain this sequence of events. The postconviction trial court, as trier of fact, found "the defendant discussed with his attorney his option regarding mitigating evidence and made a voluntary decision to forego the opportunity to call witnesses." Although this finding is not entitled to a presumption of correctness, we find that it is nonetheless correct on its merits and that it supports a conclusion that the decision not to present additional mitigating evidence was within the realm of reasonable tactical decisions.

■ In sum, counsel incorporated the mitigating evidence adduced at the guilt phase of trial into the sentencing phase. In addition, counsel was prepared to present mitigating evidence and had assembled witnesses in the courtroom in anticipation of offering their testimony. In light of Mr. Brecheen's request to forego introducing ad-

sion. In spite of the obvious importance of this issue, it is still, at its core, an evidentiary ques-

tion that is inherently tactical in nature and therefore vested in the discretion of trial counsel.

ditional evidence, however, counsel weighed several factors, including tactical considerations, and in the exercise of his professional judgment, agreed with the request. As the Supreme Court has stated, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066. Counsel then drew the jury's attention to relevant testimony they had heard that day and to other mitigating factors in an attempt to persuade the jury to spare Mr. Brecheen from the sentence that it ultimately imposed. Under these circumstances, we cannot conclude Mr. Brecheen was deprived of his constitutional right to effective assistance of counsel.[23]

## CONCLUSION

Review of a death sentence is among the most serious examinations any court of law ever undertakes. We have given exhaustive and serious consideration to Mr. Brecheen's claims, as have each of the state and federal courts preceding us, in recognition of the fact that "[o]ur duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." *Burger,* 483 U.S. at 785, 107 S.Ct. at 3121. Mr. Brecheen was tried before an impartial jury with the assistance of competent counsel in a proceeding unaffected by constitutional error. Accordingly, we **AFFIRM** the decision of the federal district court denying Mr. Brecheen's petition for a writ of habeas corpus. His request for a stay of execution, *see McFarland v. Scott,* ⸺ U.S. ⸺, ⸺, 114 S.Ct. 2568, 2573–74, 129 L.Ed.2d 666 (1994), shall be extended pending the timely filing of a petition for a stay, or for a writ of certiorari, or both, with the United States Supreme Court and during the pendency of any proceedings before that Court.

EBEL, Circuit Judge, dissenting.

This is a difficult case and my decision to dissent is a close one. I agree with much of what the majority opinion says. Indeed, my only quarrel is with the majority's conclusion that Brecheen failed to establish that he had ineffective trial counsel during the sentencing phase of the trial.

The sentencing phase of a capital case is a vitally important proceeding and it requires careful preparation, advanced consultation with the client, and vigorous advocacy. It is not a stepchild to the guilt phase of the trial, but itself deserves to share center stage with the guilt phase. "[F]ailure to present significant mitigating evidence creates a one-sided, non-adversarial sentencing hearing. Such a sentencing hearing undermines the proper functioning of the adversarial process and erodes confidence in the outcome of the case." Ronnie Seidel, *Right to Effective Assistance of Counsel at Capital Sentencing: Frey v. Fulcomer,* 66 Tem.L.Rev. 1107, 1118 (1993). *See Lockett v. Ohio,* 438 U.S. 586, 602–06, 98 S.Ct. 2954, 2963–65, 57 L.Ed.2d 973 (1978); ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, Guideline 11.4.1(A) & (C) (1989) (As soon as counsel begins a capital case he or she "should conduct independent investigations relating to the guilt/innocence phase and to the penalty phase.... The investigation ... should be conducted regardless of any initial assertion by the client that mitigation is not to be offered."). It is at the sentencing phase of the trial that the jury is asked to turn its attention away from whether the defendant is guilty or innocent and to focus on the defendant as an individual. The lawyer's job is to assist the jury in its assessment of who the defendant is and why he or she committed the crime.

Brecheen claims that his counsel, Mr. Sleeper, was ineffective because he failed to discover and present mitigating evidence that raises a reasonable probability that the jury would have declined to vote for the death penalty if such evidence had been before it. We have to decide if Sleeper's representation fell below the standard of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80

---

**23.** Because we find no constitutional error in any of Mr. Brecheen's claims, we must also reject his final claim of cumulative error. *See United States v. Rivera,* 900 F.2d 1462, 1471 (10th Cir.

1990) ("[A] cumulative-error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect [of non-errors].").

L.Ed.2d 674 (1984), and, if so, whether Brecheen was thereby prejudiced.

## I. Deficient Performance by Counsel

To prove that counsel's performance was deficient, Brecheen bears the burden of meeting the two-prong test of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In *Strickland,* the Court held that a defendant must show: (1) "that counsel's performance was deficient" with reference to prevailing professional norms, and (2) "that the deficient performance prejudiced the defense." *Id.* at 687, 104 S.Ct. at 2064; *United States v. Rivera,* 900 F.2d 1462, 1472 (10th Cir.1990). Prejudice is shown by demonstrating that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068; *Rivera,* 900 F.2d at 1472.

The majority found that Brecheen's counsel did not perform below the *Strickland* standard and, therefore, the majority did not need to address the prejudice prong of *Strickland.* The majority offers essentially three explanations for finding Brecheen's counsel not ineffective: (1) Brecheen did not want his attorney to present any mitigating evidence at the sentencing phase; (2) Sleeper adequately investigated Brecheen's background; and (3) it was a legitimate trial strategy not to put on separate mitigating evidence. I will address each of these in turn.

The first issue is the effect to be given to Brecheen's request that no mitigating evidence be put on at the sentencing stage of the trial. Although there is a dispute in the record, the district court in the state habeas proceeding concluded that Brecheen said he did not want mitigating evidence presented, and I am required to accept the state court's factual finding in that regard.

I agree with the majority that this should be evaluated not as a question of a client's waiver of an essential constitutional right, but rather as a question of whether his counsel performed up to the standards required by the Constitution in consulting with the client and in making the decision not to put on further evidence. That is, it is the counsel's conduct that is being scrutinized in this ineffective counsel claim. The majority finds support for counsel's decision not to put on further evidence from the fact that Brecheen asked that no further mitigating evidence be advanced. However, as the majority observed, the approach to be taken at the mitigation stage of a capital trial involves many technical and complicated considerations beyond the understanding and experience of most clients. The weight to be given a client's wishes either to put on evidence or to refrain from putting on evidence will depend on how well informed the client is and on the adequacy of the lawyer's advice to the client in this regard. *Blanco v. Singletary,* 943 F.2d 1477, 1502 (11th Cir.1991) ("lawyers may not blindly follow" clients' commands to forego presenting mitigating evidence because "the lawyer first must evaluate potential avenues and advise the client of those offering potential merit") (quoting *Thompson v. Wainright,* 787 F.2d 1447, 1451 (11th Cir. 1986), *cert. denied,* 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d 825 (1987)); *Jeffries v. Blodgett,* 5 F.3d 1180, 1198 (9th Cir.1993) (counsel's acquiescence in Jeffries' *informed and knowing* decision to forego mitigating evidence was not an ineffective assistance of counsel), *cert. denied,* —— U.S. ——, 114 S.Ct. 1294, 127 L.Ed.2d 647 (1994). In order to give much weight to a client's preferences as to how to present a defense, the client must have been adequately informed by his attorney about the legal ramifications of the decision and the factual evidence that could be presented and its potential significance. Most clients do not have the wherewithal to make such an important decision without their attorney's advice and guidance.

Here, the record before us establishes that Sleeper did not provide Brecheen with such information. The testimony of Brecheen and others,[1] including Sleeper, indicates that Brecheen was not so advised, nor was Sleeper in a position to give Brecheen the needed advice because Sleeper had not marshalled the

---

1. Most of the affidavits submitted on Brecheen's behalf state that Sleeper did not contact the affiants for information or to testify at the penalty phase. Sleeper did not dispute this.

evidence that could have been presented on Brecheen's behalf. Not only was a summary of the testimony that could have been presented not relayed to Brecheen, he was not made aware of the legal consequences of foregoing the presentation of separate mitigation evidence. Additionally, Brecheen was not given enough time to consider adequately the minimal information that his counsel provided to him after the jury returned its guilty verdict because the sentencing phase of the trial began almost immediately thereafter. Thus, I would give relatively little weight here to Brecheen's reactive and ill-informed desire essentially to give up and not to put on any separate mitigation defense.

Turning to the second issue of the adequacy of Sleeper's investigation, the record shows that Sleeper did not invest any significant effort in checking Brecheen's character or background for the sentencing phase of the trial.[2] Sleeper did investigate the crime; however, as the affidavits show, he did a wholly inadequate job of developing mitigating evidence of Brecheen's background and character. *Blake v. Kemp,* 758 F.2d 523, 533 (11th Cir.) ("It should be beyond cavil that an attorney who fails altogether to make any preparations for the penalty phase of a capital murder trial deprives his client of reasonably effective assistance of counsel by any objective standard of reasonableness."), *cert. denied,* 474 U.S. 998, 106 S.Ct. 374, 88 L.Ed.2d 367 (1985); *Brewer v. Aiken,* 935 F.2d 850, 858 (7th Cir.1991) (In the light of "attorney's failure to make a reasonable investigation to discover ... readily available evidence regarding [defendant's] low I.Q., susceptibility to the influence of friends and disadvantaged background, we hold that 'counsel's representation fell below an objective standard of reasonableness.' ") (quoting *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2064–65). The record reveals to me a wholly inadequate effort by Sleeper to develop and marshal mitigating evidence. He made very little effort to develop sympathetic evidence about Brecheen's background, and no effort to contact most of the townsfolk who would have testified so favorably to him.

Finally, I address the claim that Sleeper's decision not to put on mitigating evidence can be justified as trial strategy. The majority characterized Sleeper's decision as a legitimate trial strategy to get the jury back into deliberations quickly because the jurors appeared agitated. However, a trial decision based on an inadequate investigation, resulting in insufficient information, cannot be a legitimate trial strategy. When the storm hits, it is hardly strategic to choose one's course without first knowing from where the winds blow. Because Sleeper had not investigated what kind of mitigating evidence could be developed for Brecheen, he can hardly have made a defensible trial strategy at the last minute to forego' the mitigation phase of the trial.

In any event, Sleeper's "trial strategy" was to get the jury back into deliberations quickly because some jurors seemed agitated. However, there was no explanation offered why a brief presentation of mitigating evidence would do anything other than *increase* whatever doubts the jurors may already have had. This is not a case where the record reveals that the state would have put on further damaging evidence if mitigation evidence were introduced. Nor is it a case where this evidence would significantly have delayed deliberations if it had effectively been marshalled in advance. Instead, no trial strategy is offered to explain why brief, highly favorable background evidence along the lines contained in the attached affidavits of potential witnesses would have been harmful to Brecheen.

In conclusion, there was simply no adequate effort to present "aspect[s] of [Brecheen's] character" that the jury could use as a basis for determining that, notwithstanding the terrible crime for which he was convicted, he should not be given the death penalty. *Lockett,* 438 U.S. at 604, 98 S.Ct. at 2964–65. When I consider the critical role that effective presentation of mitigating evidence plays in a death penalty case, I conclude that Sleeper's assistance fell below the prevailing

**2.** It is true that Sleeper had hired an investigator. However, a review of the record shows that the investigator was hired to investigate the cir-

cumstances of the crime, not Brecheen's background. *See* Evidentiary Hearing Transcript at 23–25.

professional norms. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064.

## II. Prejudice

I next evaluate whether Sleeper's ineffective assistance of counsel prejudiced Brecheen. Applying the *Strickland* standard in *Osborn v. Shillinger,* we said that because

> the Court intended the prejudice standard to be flexible, it emphasized that "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." Instead, the defendant bears the burden of showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."

861 F.2d at 626 (quoting *Strickland,* 466 U.S. at 693, 694, 104 S.Ct. at 2067–68) (internal citations omitted). When the ineffective assistance claim relates to the sentencing phase of the trial, the standard is whether there is "a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2068. This is the test I have to apply. Do I harbor a significant doubt that this evidence would have caused at least one juror to choose life rather than death? *Chaney v. Brown,* 730 F.2d 1334, 1352 (10th Cir.1984). The jury found as an aggravating factor that Brecheen put more than one person at risk of death or great bodily injury. Against that aggravating factor and the facts of the murder, which the majority detailed, I have to decide whether the mitigating evidence that could have been presented on Brecheen's behalf raises a significant doubt about the jury's decision. *See id.* 466 U.S. at 696, 104 S.Ct. at 2068.

Habeas counsel compiled 39 affidavits from affiants who say they would have testified on Brecheen's behalf had they been requested to do so. Although the majority opinion dismisses the volume of these affidavits as cumulative, I find strength in the number of these affidavits, especially because many of them are not from relatives. Person after person came forward and said what an exemplary child and young adult Brecheen had been. For a person convicted of murder and sentenced to death, his background is atypical. The record shows that Brecheen had served in the National Guard, he was not a drug user, he was never observed fighting or drunk, he was a model prisoner, and he had a steady job, had been trusted in supervisory positions, had former employers who spoke highly of him, had good relations with his family, and had a fiancee. Many people from the community who were not related to him would have testified to acts of kindness and generosity in his life, of his compassion for a mentally retarded little girl, and of his unwillingness to kill deer, squirrels, and the hog the family raised for meat. Brecheen was active in church and had served as a youth director for two years. While in high school, he won numerous medals on the track team and went to the State High School Track Meet his senior year. Not only did he graduate from high school, but he went on to receive some vocational education.

I am apologetic about burdening the Federal Reporter with additional material; however, I think the mitigating evidence in this case cannot be fully appreciated without reading directly the affidavits sworn to on Brecheen's behalf. Considering the affidavits, one gets a sense of who Brecheen is through the eyes of those who know him and who thought his life was worthwhile and should be spared. When his conviction is considered in the context of his other life experiences, one is left with the distinct impression that his conduct the night of the murder was aberrational. Had the jurors heard this mitigating evidence, I must conclude there is a reasonable probability that at least one juror would have decided that Brecheen's life should be spared—particularly considering the fact testified to by Sleeper that several jurors seemed genuinely shaken by the verdict of guilt that they had just returned.

Sleeper's failure to present this evidence to the jury deprived Brecheen of the chance to have the jury focus on him as an individual

and on his humanity. The Supreme Court has stressed the importance of an individualized sentence determination in death penalty cases. *See, e.g., Lockett,* 438 U.S. at 602–06, 98 S.Ct. at 2963–65 (capital sentencing scheme must provide for an individualized assessment of the appropriateness of the death penalty). Brecheen did not receive that individualized consideration.

## CONCLUSION

I am left with the firm belief that there is a reasonable probability that, but for counsel's unprofessional errors, the jury would have concluded that the balance of the one aggravating factor and the mitigating evidence did not warrant death. Therefore, I must respectfully DISSENT.

## APPENDIX

### Exhibit No. 1

### State of Oklahoma

### County of Carter

I, MAMIE BRECHEEN, of lawful age and being first duly sworn upon oath, do swear and state as follows:

I am Robert Brecheen's mother. Robert is the sixth child of ten children.

Robert never gave me any trouble. He was always willing to do anything and everything I asked him to do. And he never gave his dad any trouble. He was always interested in learning anything new that his daddy was doing. Robert got along with all of his brothers and sisters and was always willing to help them do anything that they had to do. If one of them was sick, Robert was always the one who wanted to wait on them. Even when he was nothing but a child, he would get up at all hours of the night to see after his brothers and sisters. If he ever made any money, he always brought it home to me. He always wanted to have Sunday School parties at our home and he would do any kind of odd jobs, mowing the cemetary, cutting brush, helping to build fences, picking up pecans, to make extra money for these parties. He would always ask his dad if he could use his lowboy and could he have two

or three bales of hay so they could have a hayride. And afterwards, he wanted a weenie roast and some marshmellows. He always wanted me and his dad to be with them.

When we would have the Oddfellow and Rebekka picnic, Robert was always thrilled to death to get to go and be with all of the Oddfellows and paid strict attention to how they conducted themselves. He always tried to be like them, the way the acted and did. He would ask them questions. He wanted to be a Junior Oddfellow, but we moved and we lived so far out that we could not carry him to the meetings.

Robert was a cub scout and made all his medals, and I was his den mother. When his dad and I would go off on an Oddfellow meeting, he was ready and willing to take care of the smaller children. His dad and I belonged to the American Legion and the American Legion Auxilliary, and he liked to hang around the Legionaires as much as he could.

We raised a big garden. And if there was someone that didn't have a garden, he would always want vegetables to take to them. He was so generous that way. He would share anything that he had with those that were without.

Robert was always interested in helping me to can and he always wanted to see that the flowers were tended to. He took a great deal of pride in our home. Every blade of grass had to be cut away from the fences. If he would come across a hurt bird or animal, he would take it and put it in a cage feed and water it and take care of it until it could get on its own. Then he would let it go. He would never hear of anyone robbing a bird's nest. He would even squabble with me about the muddobbers nesting in the eaves of the house. He would say, mother, they've gotta have a place to build their nest.

He raised a calf for the 4–H. He would literally go out and sleep with that calf at night.

When my husband became ill with gilliam brarre (a numbing disease caused by severe staff infection), I called Robert and told him he would have to come and take his dad to St. Anthony's Hospital in the City. That was

in 1983. Robert went with us up there and he would not leave his dad's room, but stayed right there with him. When we came home, Robert moved in with us. He took care of his daddy. He seen that he had a bath; he would get into the bathtub with him and hold him up while he bathed him. He would ask his dad all through the day, if he was hungry or thirsty. He wanted to give him whatever he wanted. At this time, Robert had taken a leave from work so he could be with his dad, day and night.

I know that Robert did not need any money at the time of the so-called robbery/murder because he had over $2,000 in my checking account at that time. He had given it to me to keep for him, because he had such a tendency to give to anyone who needed money.

His dad had told him that if he ever at any time needed any money, to let us know. We knew Robert would pay it back, so I know he did not need any money. I told this to Robert's trial attorney and even showed him the bank account. It was Robert's income tax return and money he saved every two weeks from his paycheck. He had been saving this money for a long time. He did draw out money to get us a television set at Christmas, with remote control, but there was still over $2,000 at the time of this happening. We used part of the money to pay for Robert's trial attorney.

Mr. Sleeper only spoke to Robert twice before the trial. He never talked to me except for one time. He didn't tell us until the day of trial that he was not a criminal lawyer. Mr. Sleeper never asked me to testify for my son. I would naturally have been more than willing to testify. I would liked to have had a chance to tell the jury what kind of a son I had. Why, Robert wouldn't even go kill his dad a mess of squirrels, even though his dad wanted them and Robert knew his dad was sick and would have done, and did do, just about anything his dad asked of him. But he couldn't kill those squirrels for any reason. He told his dad he would find a friend to get the squirrels for him.

I would have welcomed the opportunity to tell the jury about Robert and I would welcome that opportunity today. But I was never asked to testify at the trial.

Robert is just not the kind of person to have killed anything. He couldn't stand the sight of blood and couldn't stand the thought of anything hurt or killed. All of my kids were raised in the church and raised to know right from wrong and Robert would not steal and he certainly would not kill.

Further affiant saieth not.

/s/ Mamie Brecheen
Mamie Brecheen

Subscribed and sworn to before me this 27th day of April, 1988.

/s/ Karen Billing
Notary Public

My Commission Expires:

2/22/89

Exhibit No. 2

State of Oklahoma

County of Carter

I, MAMIE LAROCHE, of lawful age and being first duly sworn upon oath do swear and state as follows:

I am the oldest of ten Brecheen children. Robert is my brother; he is the sixth child. I was 11 years old when Robert is born.

Robert was a very quiet child. He would lay in his crib and coo and laugh to himself. I took care of him part of the time. He was a very loving and playful child. He liked to play with trucks of all kinds and would sit for hours, making roads and push his trucks up and down his roads. He would have to occupy himself as his older brother did not play very much, as he was a kind of loner. Robert liked school a lot because there were kids to play with. Once he got his nose broken because a little boy at school was going to hit a girl with a large rock. Robert stepped in front to keep the little girl from getting hurt. The rock broke Robert's nose and he was in the hospital for two days. Robert was in the 4th grade at that time. I told Robert that I thought that was a very foolish thing to do and Robert said "But Snookie, that boy was

going to hurt that little girl, and I couldn't let it happen."

When my folks moved to Springer Oklahoma from Comanche, Robert was about 13 years old. He had never seen a black person before. But the school in Graham was made up almost entirely of blacks. In fact, Robert was the only white boy in the school. Nevertheless, Robert fit right in and had no problem making friends. He played basketball and became good friends with all his classmates.

After Robert graduated from high school and began working, Robert would often help out around our parents house, by working or by getting things for our folks that they needed.

After high school, Robert joined the National Guard and transferred to the Airborn National Guard in Pasadena Texas. He was a paratrooper. He was also working at a full time job at that time. I saw Robert frequently at that time. He would bring meat, chips and dips and beer and pop. My husband and I and my three kids and my grandparents would have a barbeque. Robert would provide the majority of the food for these get-togethers and we all really enjoyed each others' company. We also went fishing and spent a lot of time just visiting and playing cards.

In 1978, Robert returned to Graham and began working for Pride Well Service.

Robert always came to eat the Christmas and Thanksgiving turkey at our house. He would come over the night before and spend the night. We would come over to mother's for the holidays, but he would always come over to my house later to eat supper at my house.

Robert was a peace maker. Whenever the girls would get into a tiff, Robert would try to ease the disagreement by talking to each and trying to convince them to make up and stop fighting. Robert still is the peace maker. Still tries to keep everybody happy even from death row.

Robert was never violent and disliked arguments and fights. He would get de-

pressed if someone was fighting and he could not convince them to make up. He would always try to get the family members to try to talk out their differences.

When the kids were little, there would always be some kind of squabble about not enough candy. Robert, who always had some kind of odd job to make extra money, bought a huge bag of candy so the kids would quit fighting. There was so much candy that the kids began to get sick from eating candy. Robert said he wanted them to eat candy until they were sick so they would never fight over candy again.

There were not many kids living in the Graham area, but Robert attended church at Milo Baptist Church regularly and was active in getting activities going. He would get all the kids he could find and would organize activities for them. They would borrow someone truck, someone else's hay and they would all go on a hay ride. Robert would get the preacher or some other adult to drive and then they would meet at someone's house for a weenie roast. Everyone's mother would donate a pack of weenies, some buns, and they would have a good time. Robert would mow the cemetary lawn for $10 or $15. He would come home and want to have a party for the kids. Black or white, it didn't matter to Robert, he would spend his own money on some kind of barbeque or weenie roast or some kind of activity. Every kid in the community would be invited.

Robert loves football and was a big Washington Redskin fan. My daughter was a Dallas Cowboy fan. He and Tammy would fuss good naturedly over football games. He would make out rageous bets with her and usually would lose. He would always pay up, though when Tammy won the bet, Robert never asked her to pay.

Robert was very loving and loved children. He loved all his nieces and nephews and would spend a fortune on all of them for Christmas. He would then come over to thehouse and spend hours playing with the kids. Sometimes it looked like he came to visit the kids more than the adults.

We would often go to Sulphur for a picnic and Robert would spend all day playing with

the kids, softball, chase and all kinds of games he would make up.

If anyone was sad or depressed, Robert would be the first one to try to cheer them up. He never showed partiality to any of the kids and always treated all of themequally so there wouldn't be any bickering.

Once, while Robert was on deathrow, he traded some of his allowence to one of the other inmates, who made crocheted flowers. He made each of us a bouquet of crocheted flowers and Robert bought a bottle of ladies cologne to spray on the flowers so they would smell good.

Robert was and is a thoughtful, generous and kind hearted person. He worked hard all his life to help out his family and never would complain.

Robert's lawyer, Gary Sleeper, asked me about testifying in his behalf at the trial. Of course, I would have testified for him. Mr. Sleeper asked me if I could contain my emotions enough to testify and asked my husband if he could get off work to testify. We thought we would be testifying. But Mr. Sleeper said that for every person he could put on to say good things about Robert, the prosecution would put on more to say Robert was bad. So, Mr. Sleeper decided not to put any of us on the stand to testify for Robert. The guilt stage ended at about 7:00 p.m. Everyone went to eat and the second stage started late at night.

I would have testified and wanted to testify for Robert. I would testify now because I don't believe Robert got a fair trial and I don't believe that Robert commited any murder. He is a kind gentle person and it is not in his character to hurt a living thing.

Further affiant saieth not.

/s/ Mamie Laroche
Mamie Laroche

Subscribed and sworn to before me this 27th day of April, 1988.

/s/ Karen Billing
Notary Public

My Commission Expires:
2/22/89

Exhibit No. 3

State of Oklahoma

County of Carter

I, LOYCE M. FREEMAN, of lawful age and being first duly sworn upon oath, do swear and state as follows:

Robert Brecheen is my older brother and I have known him all my life. Robert and I have always been very close. We went to church and sunday school together. We were involved in C.A. (Christian Association) rallies and Robert participated regularly. We would see how many kids we could get rounded up to come to church. You would get awards for how many kids you could bring to church and we won several awards. Robert was youth director at Milo Baptist Church for two years. Robert would organize all kinds of youth activities, such as hayrides, weenie roasts, youth sings and Robert would organize it all. Robert organized an Easter program one year about the resurrection of Christ called "Christ Lives". It was a big success and everyone enjoyed it. He organized a youth night. We would meet on one Wednesday night every month. On Youth Night, we would have a service and the youth would organize it and put it on. We would have a sermon, sing hymns. Robert would assign a different part for everyone and we would put on the service.

As a family, we were all very close. We always worked hard and played hard together. Whenever there was something that needed to be done, Robert would make it into a contest to see who could get the most done the fastest. He was always willing to help out with any chores or work that needed doing, and he could usually make it seem like fun.

Robert is a very sensitive person. He was always there whenever I needed him to help me with my problems. If I had a falling out with momma or a fight with a boyfriend or was feeling down, Robert couldn't stand to see me cry. We would walk out to "feed the chickens" across the creek. That was where we would do a lot of our talking. Robert used to always tell me, don't cry, it will be okay. He would say there would always be other boyfriends, your grades will get better,

or whatever the problem, he would try to comfort me and convince me that it would get better.

Robert loved basketball and he played with the school team. He was a real goodbasketball. He also played baseball in the pasture in the summertime. All of us would be out there playing baseball.

Robert has always been nice to everyone he ever knew. I don't believe he ever met a stranger. He got me my first date. The boy was in Robert's class at school and one day, Robert told me he had someone he wanted me to meet. When I asked him who it was and Robert told me, I said well, I hope you don't want me to go out with him. It was a boy I knew and I didn't want to go out with him. Robert told me to be nice to him, to be courteous to him, because Robert liked him. So, we went out and when we started dating, Robert was thrilled about it. But I really did it as a favor to Robert, because he had asked me to.

Robert was always good with kids. He loved kids and they loved him. He was always playing with them, taking them places and buying treats and toys for all his nieces and nephews. All the younger kids loved for Robert to take them with him to feed the cows. That was real exciting for them.

One time, during a big ice storm, Robert took Phillip, his nephew with him out to feed the cows. The pond was covered with ice. First he tested it to make sure it would hold, and when it did, Robert and Phillip went skating all over that pond. Phillip remembers the fun they had that day.

Robert was always looking for bargains and for things to make our lives easier. He took good care of us all and especially mom and dad.

I don't believe that Robert would commit robbery because he didn't really need money. Robert knew that if he had any problems, he could come to me or my sister, Joyce, or any of us. He knew we would help him. Robert had borrowed money from me before—$2,000—and he knew that I had savings. He also knew that I could borrow just about any amount of money I wanted to because my house was paid for. He knew I would give him money if he needed it. He always paid me back whatever he had borrowed. I know that Robert would not have killed another man for money. He had a good job at the time with Lincoln Rock Company and was planning on getting married. He had bills, but he was paying them. He didn't need money that bad.

I know that Robert would not have killed a man. He had morals. He grew up in the church and he knew right from wrong. We all did. This is a real spirtual community and we were all taught the same way.

At the time all this happened, Robert was living at home most of the time. He stayed with a friend some of the time because of his job. He would ride to work with him. But he would come home after work to see if daddy needed anything. He would walk daddy, bathe him, and be with him and take care of him and momma.

We all asked Gary Sleeper, Robert's trial lawyer, to call us to the stand to testify for Robert as character witnesses. We were all there most of the time during the trial and could have testified. Mr. Sleeper said that for ever one person he could call to say that Robert was a good old boy, the State would call 50 to say he was a sorry old boy. So he said he wouldn't call anyone. We figured Mr. Sleeper was the lawyer and he knew what he was doing and we had never had trouble with the law, so we didn't know anything. But all of the family would have done anything at all to help Robert if we could.

I would welcome the opportunity to testify for Robert now.

Further affiant saieth not.

/s/ <u>Loyce M. Freeman</u>
Loyce M. Freeman

Subscribed and sworn to before me, this <u>27th</u> day of April, 1988.

/s/ <u>Karen Billing</u>
Notary Public

My Commission Expires:

<u>2/22/89</u>

Exhibit No. 4

State of Oklahoma

County of Carter

I, JOYCE M. SKELTON, of lawful age and being first duly sworn upon oath, do swear and state as follows:

Robert Brecheen is my older brother and I have known him all my life.

Robert and I were the ones who done most of the work around the house. We would split wood, mow the yard and do other chores around the house. We were in Future Farmers of America and 4-H Club. He had a steer that he put in the County Fair in Ardmore. He sold the steer there at the fair and used the money to pay the man who give him the money for the steer and kept the remainder. That's how he made his extra money at the time. I had sheep and Robert would help me groom the sheep. He would go around and ask other people for tips on how to groom the sheep and make them prettier. He would help Loyce with her hogs and every fair, we were all in it.

We all played baseball in the summertime in the pasture. Robert would go out and mow the pasture far enough back so we could play baseball. When momma and daddy would go into town to get groceries, thats when we would play. And that was how Robert kept an eye on us kids.

We didn't have a lot of time to play because there was a lot of work to do. There was wood to cut, and the yard and garden to tend, animals to care for.

I was a homebody until I was 24 yrs old. I didn't date or go out much. Robert used to encourage me to get out. He would try to talk me into getting out and getting a boyfriend, or dating. He would take me out himself, riding around the town. When I finally met the man that I married, Robert knew and told me I had made a good choice.

At Christmas, the year before all this happened, Robert came to my house. He asked me what to get momma and daddy for Christmas. I told him mom and daddy were hard to buy for because they had so much stuff. He said well, he was going to get them a T.V. with a remote control so neither of them would have to get up to turn the channel. Then he asked me what to get the kids. I didn't have any children at the time, but he wanted to get presents for all the nieces and nephews. He was so generous and spent a lot of money on buying presents for his family.

One time, momma and daddy bought a hog to butcher to put up meat for the freezer. We all hated the idea. And momma and daddy said, it's time to kill that hog, because we gotta eat. So they sent Robert down there to kill the hog, and he come back and momma asked, did you kill that hog. Robert said no, momma, I looked at that hog, and I can't do it. So momma had to be the one to go down there and kill that hog. We always teased Robert because he couldn't kill that hog.

Momma was against pop and kool-aid and they wouldn't buy it for us kids. But Robert would work and make some extra money and he would go out to the road and flag someone down and ask them to carry us up to the store and he would bring us a pop.

I attended Robert's trial everyday. His lawyer never talked to me about testifying at Robert's trial. I am the quiet type, but I would have testifed at Robert's trial if I had been asked to. We were church going people and we were raised in the church, and we all were raised to know right from wrong. Robert could never have gone to that house to rob those people. My sister and I had money and could have borrowed any amount of money he might have needed. And Robert knew that.

I have tried my best to put myself in Robert's place, and I have gone step by step, just to see if it is possible that Robert could have done such a thing, and I always come up negative. I just know that Robert could not have done what he has been convicted of doing.

These are things I would have wanted to tell that jury about Robert.

Further affiant saieth not.

/s/ Joyce M. Skelton
Joyce M. Skelton

Subscribed and sworn to before me this 27th day of April, 1988.

/s/ Karen Billing
Notary Public

My Commission Expires:

2/22/89

Exhibit No. 5

State of Oklahoma

County of Carter

I, THERESA DIANE DURHAM, of lawful age and being first duly sworn, upon oath, do swear and state as follows:

Robert Brecheen is my older brother and I have known him all my life. Robert is a very honest person. He has never been a selfish person. He respects the feelings of others. He is the type of person who wants to help others if they are hurt or in need. Robert was always very well liked and had a lot of friends. He was fun loving and happy and shared everything he ever had with anyone that needed. He was generous with his time, money and property.

Robert was a sensitive young man who hated to see anything hurt. One time, when I was about 13 and Robert was about 18, he went deer hunting. After he got back, a friend asked him if he had got a deer. Robert said no, that he had seen a buck deer and that it was close enough for Robert to look into his eyes. Robert said he had his gun and was ready to shoot the dear, but instead Robert started to cry and was not able to pull the trigger. He described this incident to me in detail, telling how the hill looked, how the deer looked and how he felt at the time. Robert never had an interest in hunting after that and I believe that was the only time Robert ever went hunting although hunting was a popular passtime among boys his age.

Robert never liked to argue or fight with anyone and would just as soon to walk away from a fight. It didn't bother him. I never saw him lose his temper. He was mellow and easy going and didn't like to see anyone fight or argue.

Robert and I were very close. We were close in age and since I was a tomboy and liked to played football, basketball and other games. When I would have a problem, I would go to Robert and he could usually help me. He wasn't always easy on me and would often speak to me harshly to get me to straighten up. He always treated me well and with love.

When I graduated from high school, Robert came all the way from Houston to see me graduate. My other brothers and sisters didn't think it was a big deal and didn't have much time to make a fuss. But Robert brought me a jewelry box which I still have today. He made that day very special to me and I will never forget it.

I was never asked to testify but I would have if I had had the chance. Robert is my brother and I love him and I know he would not ever hurt another human being. I would testify now if I could and ask the jury to spare my brother's life.

Further affiant sayeth not.

/s/ Theresa D. Durham
Theresa D. Durham

Subscribed and sworn to before me this 23rd day of April, 1988.

/s/ Karen Billing
Notary Public

My Commission Expires:

2/22/89

Exhibit No. 6

State of Oklahoma

County of Carter

I, DAVID LAROCHE, of lawful age and being first duly sworn upon oath do swear and state as follows:

I have known Robert Brecheen for over 23 years. He is my brother-in-law, and I have had an opportunity to watch him grow up. In the time I have known Robert, I never saw him lose his temper and he was always easy-going. Even when he was young and he would play football with some of the older guys. Sometimes the games would get pretty rough. A lot of young kids would get mad when the wind got knocked out of them, but

Robert would just shake it off and get back in the game. I never knew of Robert having any trouble with the police or of him being a disciplinary problem in school. I never knew anybody to not like Robert. He was a very likeable young man and had many friends.

Robert helped our family out many times. ONe time in particular was after I had had a heart attack in 1977. I was off work for a while and financially we were having a hard time. Robert bought a 30–30 rifle from me. When I went to get the rifle for him, he told me to keep it and said that he didn't like guns and didn't care for hunting. He had bought the rifle simply to help us out.

I worked with Robert one time on an oil rig. Robert was my supervisor for about 6 months. During that time, I observed him to be a very hard worker and I never saw him lose his temper.

When Robert was a teenager, he would do odd jobs in the community for extra money. He would always spend part of the money on treats for his niece, Tammy. He would never come to our home without bringing candy for the babies.

I was never contacted by any attorney and asked to testify in court on Robert's behalf and I never could understand why Robert lawyer did not call any character witnesses. I would have been glad to testify if I had been called and I would testify today if it were necessary.

Further affiant sayeth not.

/s/ David LaRoche
David LaRoche

Subscribed and sworn to before me this 23rd day of April, 1988.

/s/ Karen Billing
Notary Public

My Commission Expires:
2/22/89

Exhibit No. 7

State of Oklahoma

County of Carter

I, TAMMY LYNN LAROCHE, of lawful age and being first duly sworn upon oath do swear and state as follows:

Robert Brecheen is my uncle and I have known him all my life.

Uncle Robert was a real fun loving person. He was always good to me. Whenever Robert would visit he would usually bring some kind of candy or treat. He would take us to Sulphur to the National Park where we would picnic, swim and just have fun. He would tease and joke with us and try to throw us in the water.

Uncle Robert was always in a good mood and I hardly ever saw him mad at anyone. If he ever was made at someone, he would just make a joke out of it.

Robert was a big football fan and would come over to our house on Sundays for dinner. He liked the Washington Redskins and I liked the Dallas Cowboys. We would always get into discussions about who was the best football team. We would make bets on the games and if he won, I would have to iron his shirts or do some other kind of chore for him. But if I won, he would have to pay me money. He always paid and he nearly went broke because I almost always won. He hardly ever won. Robert also told all us kids that he would give us money for every A we made in school. He nearly went broke with that too.

One time, Robert took me, my sister, Debbie, and my friend, Michele Monroe, to Ardmore to do Christmas shopping. We went to the Stubbs Western Store and Robert cashed his paycheck. Robert was looking for a pair of boots for me which was going to be my Christmas present.

We went to several stores in Ardmore and we were gone almost all day. We were late coming home because we were having such a good time that we lost track of the time. Michele's parents weren't worried because they knew she was with Robert and they knew he would take care of us.

Robert was a lot of fun to be with. He was always joking and having a good time. It was sometimes hard to know when he was serious. He would tease and play with us all.

Robert was always there for just about anyone who needed him. Although I never

had any serious problems, I know that I could go to Robert anytime and he would help me if he could.

I write to Robert regularly now and he writes me back. I have visited him at McAlester several times.

I was only a junior in high school when Robert's trial was going on, but I would have been glad to testify at Robert's trial if I could have. I would have wanted to tell the jury that Robert is not the kind of person to have commited the crime they said he committed and that if they only knew what a kind and good person Robert was, then they would know that he could not have done what they said.

I would testify now if I had the opportunity.

Further affiant saieth not.

/s/ Tammy Lynn LaRoche
Tammy Lynn LaRoche

Subscribed and sworn to before me this 23rd day of April, 1988.

/s/ Karen Billing
Notary Public

My Commission Expires:

2/22/89

Exhibit No. 8

State of Oklahoma

County of Carter

I, DWIGHT A. ANDERSON, of lawful age and being first duly sworn upon oath, do swear and state as follows:

I have known Robert Brecheen since his family moved from Comanche to Springer. He was much younger than I was, but we became friends. He would come by our house and visit with my family. He was a friendly and nice guy and I was very surprised to hear that he had been arrested for murder. I cannot believe he committed such a crime. Robert was real friendly. We would go over to black clubs and there wasn't any trouble at all. Robert got along with everyone.

Before Robert was arrested for murder, he had come to me and said he was getting married and was going to get a place over in Sulphur and put a trailer on it. He said he was going to rent a backhoe and he wanted me to run it to dig the septic tank. I said I would do it for him.

I was never contacted by anyone about testifying at Robert's trial, but if anyone had asked me, I would have been glad to testify and I would testify today if I had the opportunity.

Further affiant saieth not.

/s/ Dwight A. Anderson
Dwight A. Anderson

Subscribed and sworn to before me this 25th day of April, 1988.

/s/ Karen Billing
Notary Public

My Commission Expires:

2/22/89

Exhibit No. 9

State of Oklahoma

County of Carter

I, THEODORE ANDERSON, of lawful age and being first duly sworn upon oath, do swear and state as follows:

I was the custodian at Graham School. For three years Robert Brecheen worked with me. He was a very hard worker. He would do whatever I asked him to do, cleaning, mopping, waxing, painting, repairs, anything. He never gave no trouble of any kind. He worked hard and always did a good job. I could depend on him.

I was shocked to hear of Robert's trouble and still to this day I don't believe it.

Robert's attorney never contacted me or asked me to testify in his behalf. I would have been willing to testify because Robert was a good kid. He gave me the greatest respect, and I would have been glad to talk for him. I would still be willing to testify for Robert if I were given the opportunity.

Further affiant saieth not.

/s/ Theodore Anderson
Theodore Anderson

Subscribed and sworn to before me this 25th day of April, 1988.

/s/ Karen Billing
Notary Public

My Commission Expires:

2/22/89

## Exhibit No. 10

### State of Oklahoma

### County of Carter

I, CLAUDETTE ANDERSON, of lawful age and being first duly sworn upon oath, do swear and state as follows:

I first met Robert Brecheen in 1969 when I worked as a teacher at Graham School. Robert was in the higher grades and I taught the lower grades, but often I was called into his class to relieve the other teacher. Robert was always very respectful to me. While some of the other kids might try to get away with something when they had a substitute, Robert never did. He would just always do whatever was asked of him.

Robert often came to our home to visit with our family. He would eat with us, play with our kids and was really a friendly boy. He was really helpful and would do anything or help out in any way that was needed.

I was very surprised to hear of the murder charge against Robert. I really just couldn't believe it.

I don't see Robert as being a violent type of person who could have killed another person.

I was never contacted by an attorney or asked to testify for Robert Brecheen as a character witness. If I had been asked, I would have been glad to testify in Robert's behalf. I would be willing to testify at this time, if asked to do so.

Further affiant saieth not.

/s/ Claudette Anderson
Claudette Anderson

Subscribed and sworn to before me this 27th day of April, 1988.

/s/ Karen Billing
Notary Public

My Commission Expires:

2/22/89

## Exhibit No. 11

### State of Oklahoma

### County of Carter

I, GILBERT ANDERSON, of lawful age and being first duly sworn upon oath do swear and state as follows:

I met Robert Brecheen through my brothers who went to school with him. I never knew anything bad about Robert. He was known as a friendly, fun loving, hard working fellow. Everytime I saw Robert with my brothers, they were always laughing, joking and enjoying each other's company.

I never knew Robert to be violent or in any kind of trouble. He was the type of person who was a friend to everyone, black and white alike. I never knew anyone who didn't like Robert.

I was never contacted during Robert's trial about testifying as a character witness for Robert. But I would have been willing to testify as to what I know of Robert's character if I had been asked to do so. I would be glad to testify now if I had the opportunity.

Further affiant saieth not.

/s/ Gilbert Anderson
Gilbert Anderson

Subscribed and sworn to before me this 23rd day of April, 1988.

/s/ Karen Billing
Notary Public

My Commission Expires:

2/22/89

Exhibit No. 12

State of Oklahoma

County of Carter

I, OTTO BROWN, of lawful age and being first duly sworn upon oath, do swear and state:

I first met Robert Brecheen when he began to go to school with my kids. I would see him around the school, at ballgames and so on.

Robert was a reliable, friendly, respectable person. He was good friends with my boys. He would come over to our home. He was always willing to help me collect my pigs when they got loose.

I was very surprised when I learned that Robert had been arrested for murder. I just couldn't believe it. I never though Robert the type to do violence. I was also surprised that he was convicted and given the death penalty.

I would have testified as a character witness for Robert, if I had been asked to do it, but no one ever contacted me about it. I would be willing to testify now, if there were a hearing.

Further affiant saieth not.

/s/ Otto Brown
Otto Brown

Subscribed and sworn to before me this 25th day of April, 1988.

/s/ Karen Billing
Notary Public

My Commission Expires:
2/22/89

Exhibit No. 13

State of Oklahoma

County of Carter

I, LARRY D. BROWN, of lawful age and being first duly sworn upon oath, do swear and state as follows:

I met Robert Brecheen at Graham School. I was a few years ahead of Robert, but we became friends. You couldn't help but like Robert. He was so friendly, he would always come up and talk to you and he was a lot of fun to be around. We played basketball, went fishing, and did a lot of talking. Every time I would see Robert, he would stop and talk with me and visit.

Robert would often come to our house to visit. We would mostly just sit around and talk about whatever was on our minds.

I was very surprised to hear that Robert had been charged with murder. I never could believe that Robert would do anything like that. Robert was a friendly, smiling, happy person. I never saw him lose his temper or get in fights or behave in anyway that was violent. It is hard to believe that Robert was convicted and got sentenced to death.

No one ever asked me to testify for Robert at his trial, but I would have done so, if I had been asked. I would testify at a hearing today, if I could.

Further affiant saieth not.

/s/ Larry D. Brown
Larry D. Brown

Subscribed and sworn to before me this 25th day of April, 1988.

/s/ Karen Billing
Notary Public

My Commission Expires:
2/22/89

Exhibit No. 14

State of Oklahoma

County of Carter

I, LILLIE BROWN, of lawful age and being first duly sworn upon oath, do swear and state as follows:

I first met Robert Brecheen when he went to school in Graham with my kids. Robert was very friendly and would often come to our house. He would come over and sit and talk with me about school, fishing or whatever was on his mind. Whenever I would see him about town, he would always come over and visit with me. I loved Robert. He was always polite and courteous and never any trouble.

I couldn't believe when Robert was charged with murder. I never saw Robert lose his temper or behave in a violent way. He was so nice and always had a smile for me.

I would have been glad to testify at Robert's trial, but I was never contacted by anyone or asked to come to the trial. I would be willing to testify at a hearing now, if the opportunity came.

Further affiant saieth not.

/s/ Lillie Brown
Lillie Brown

Subscribed and sworn to before me this 25th day of April, 1988.

/s/ Karen Billing
Notary Public

My Commission Expires:

2/22/89

Exhibit No. 15

State of Oklahoma

County of Carter

I, JACK E. BROWN, of lawful age and being first duly sworn upon oath, do swear and state as follows:

I have known Robert Brecheen since 1968 when his family moved from Comanche and we began to go to school together. We became good friends, ran around together and went to town together. Later, we worked at the same place at Hamp Baker Construction Co. Ray Clour Well Service and Lindsay Well Service.

I never knew Robert to be a mean person. I never felt he would do anything to hurt another person or living thing. He was a real good likeable person. He was easy going and very generous with his money and property. If a friend had no money and Robert had money, then they both had money. He was always willing to share anything with anyone.

I was Robert's boss for a time at Lindsay Well Service. I found him to be a dependable, hard working employee. Everyone liked him. He had several others working under him and he was a good leader and got along well with his crew. He had good control and was able to keep them working by joking and goofing around with them. The crew wanted to work well for Robert because they liked him.

We were all very shocked to hear that he had been charged with murder. I cannot imaging that he could commit such a crime. He was very even tempered. I don't remember him ever seeing him even get into fights.

No one ever contacted me to ask me to testify for Robert at his trial, but if someone had ever asked me, I would gladly have spoken for Robert Brecheen. I would be happy to have an opportunity to testify as to his character.

Further affiant sayeth not.

/s/ Jack E. Brown
Jack E. Brown

Subscribed and sworn to before me this 23rd day of April, 1988.

/s/ Karen Billing
Notary Public

My Commission Expires:

2/22/89

**1386**

Exhibit No. 16

STATE OF OKLAHOMA )
) ss:
COUNTY OF CARTER )

Robert and I have been friends for a great number of years. We went to school together. and he also live with us for several mos. There wasn't a thing he wouldn't do for us. He worked in the oil-field with me. I have borrowed money for Robert A couple of times. which he has repaid back. Robert has been a good and true friend and I don't believe he would kill anyone. Not for any reason. Robert could go get what he wanted from his family or friends. We love him then and now. Robert did not get a fair trial. I will always believe he is innocent. Robert has never been in any trouble, since I've known him. If I can be of any help Please let me know.

*Jack Brown*

Subscribed and sworn to before me this 23rd day of April, 1988.

My Commission Expires:
9/27/89

_____
Karen Dillard
NOTARY PUBLIC

Exhibit No. 17

STATE OF OKLAHOMA )
 ) ss:
COUNTY OF CARTER )

I have known Robert Brecheen for a good many years, about 20 to be exact. We went to school together and graduated together, after that we didn't see Robert for awhile. Then he started to work with my husband. So he ask us if he could stay with us while he was working with my husband. Robert stayed with us for about six months, then he got married. We love and trusted Robert then and now even more, because we believe Robert did not kill Mrs. Stubbs. He never did steal or hurt anything or anyone. If Robert was to get out of prison, he would be welcome at our house anytime. Robert may have some problems at times, but show me a person that don't. I would do anything to get Robert off of death row, because like I said I don't believe he did it.

Paulette Brown

Subscribed and sworn to before me this 23rd day of April, 1988.
My Commission Expires:
5/23/89

## Exhibit No. 18

Affidavit

State of Oklahoma

County of Carter

I, Bertha Brown, P.O. Box 2, Graham, OK 73437, of lawful age and being first duly sworn upon oath, do swear and state that the matters set forth below are true and correct.

I have known Robert Brecheen for about 12 years. He went to school with my son and was around our home quite a bit. Robert never caused any trouble and was a good boy.

I did not attend the trial but I do not believe there were any character witnesses called for Robert. I would have testified for Robert but I was never contacted by Robert's trial attorney.

Further affiant sayeth not.

/s/ Bertha Brown
Bertha Brown

Subscribed and sworn to before me this 23rd day of April, 1988.

/s/ Karen Billing
Notary Public

My Commission Expires:
2/22/89

## Exhibit No. 19

State of Oklahoma

County of Carter

I, DORIS CHATHAM, of lawful age and being first duly sworn upon oath do swear and state as follows:

I have known Robert since about a year before his trial. I met him through my husband, Verdell Chatham.

I remember Robert as a fun-loving young man. We often would see Robert and his girlfriend at the Arbuckle Ballroom. He loved to dance and would dance almost every dance. He was a great dancer and could do the two-step, cotton eyed joe, Paul Jones, and all the other country dances.

Robert was very polite and respectful to everyone. He loved to have a good time and he liked to see others have fun. He would often dress up in a gorilla suit at intermission just to entertain others at the dance. I never saw Robert drunk or out of line.

I was never asked to testify as a character witness at Robert's trial although I attended the trial every day. I would have been willing to testify, and I would be willing to testify today if I had the opportunity.

Further affiant saieth not.

/s/ Doris Chatham
Doris Chatham

Subscribed and sworn to before me this 23rd day of April, 1988.

/s/ Karen Billing
Notary Public

My Commission Expires:
2/22/89

## Exhibit No. 20

State of Oklahoma

County of Carter

I, Verdell Chatham, of Ratliff City, Oklahoma, of lawful age and being first duly sworn upon oath, do swear and state as follows:

I have known Robert Brecheen for approximately 12 years. Robert's father and my son, who is now deceased, worked together at Gulf Oil Company.

Robert was a very likeable kid. It would be hard to keep from liking him. He always had a smile on his face and was always hard working and good natured. I knew Robert's employer, Gene Smith at Lincoln Rock Company and I knew Robert had the reputation of being a good and hard worker who got along with people real well. Robert had asked me for work at one time, but I had no openings. If I had, I would have hired him because I knew him to be a good worker.

I never knew Robert to be in any trouble or to behave in anyway that was offensive to anyone. I never saw him drink any hard liquor, never saw him drunk. We socialized some with him at Arbuckle Ballroom and

Robert was always dancing and joking and having fun.

I am sure that Robert was not in need of money at the time of the murder. I always had a large sum of money on me and did at that time. I know that Robert would have come to me if he needed money and I would have been glad to lend it to him.

Robert was always in good company and I never saw him with any low class people, hoodlems or bums. He was always respectful and courteous.

I was never asked to testify at Robert's trial but I would certainly have done so if I had been asked. I would do so now if I had the opportunity.

I was shocked to hear of the trouble Robert was accused of and find it very hard to believe Robert Brecheen could have committed such a crime, especially since the motive was supposed to be for money.

Further affiant saieth not.

/s/ Verdell Chatham
Verdell Chatham

Subscribed and sworn to before me this 23rd day of April, 1988.

/s/ Karen Billing
Notary Public

My Commission Expires:

2/23/89

Exhibit No. 21

State of Oklahoma

County of Carter

I, GEORGE ANTHONY DEAN, of lawful age and being first duly sworn upon oath do swear and state as follows:

I have known Robert for approximately 18 years. I first met Robert through Jack Brown when the two of them were in school. Later I worked with Robert at Ray Clours Well Service.

I knew Robert to be a full loving guy. I never saw him lose his temper or get mad at anything. We also played basketball togeth-er and he would come to our home to play cards and other board games.

I do not believe that Robert commited murder as it is not in his character. He did not have a mean streak and I always found him to be generous and good. If he had money and a friend had no money, he would share.

I was never contacted by Robert's attorney or asked to testify as a character witness. I would have testified for him if I had been asked to. I would testify now if I had the opportunity.

Further affiant sayeth not.

/s/ George A. Dean
George A. Dean

Subscribed and sworn to before me this 23rd day of April, 1988.

/s/ Karen Billing
Notary Public

My Commission Expires:

2/22/89

Exhibit No. 22

Affidavit

State of Oklahoma

County of Carter

I, LOYCE DEAN, Box 21109, Healdton, Oklahoma, of lawful age and being first duly sworn upon oath, do swear and state that the matters set forth below are true and correct.

I have known Robert Brecheen for approximately 20 to 25 years, as he attended school with my younger brother and was often in our home. Later, Robert worked with my husband in the oil field business. Also, Robert was employed with the Pride Well Service Co. while I was also employed there.

I found Robert to be a happy, carefree young man who was very popular and well liked. I never knew Robert to be violent or cruel in any way and there is no way I could ever believe that he could cold-bloodedly kill someone. He was never even involved in the usual arguments or fights as a kid. Robert was always polite, courteous, and kind hearted. I was shocked when I learned of the charges against him and even more shocked

when he was found guilty. I could not believe he was given the death penalty when so many other admitted murderers are given a life sentence.

I was never contacted before or during Robert's trial or asked to testify by any attorney, but I would have been glad to testify for Robert if I had been contacted. I know he didn't get a fair trial.

Further affiant sayeth not.

/s/ Loyce Dean
Loyce Dean

Subscribed and sworn to before me this 23rd day of April, 1988.

/s/ Karen Billing
Notary Public

My Commission Expires:

2/22/89

Exhibit No. 23

State of Oklahoma

County of Carter

I, MILES DOUGLAS, of lawful age and being first duly sworn upon oath do swear and state as follows:

I have known Robert Brecheen for about 15 years, ever since he and his family moved to Springer from Comanche. I was Robert's school bus driver from about 1971 until 1974. During that time, I never had any trouble from Robert. I never heard of Robert ever having a harsh word for anyone. He was polite and respectful and was always helpful on the bus. During recess he would go out and sweep out the bus without anyone ever asking him to do so. He often would help the younger children off and onto the bus. Often he would take the smaller kids across the road.

I never heard of Robert being in any trouble with the law or at school. He often came by my house and whatever work I was doing, carpentry, yard work or gardening, Robert would just start right to work helping me out. Robert would just come by if he had been fishing and had caught any fish, and he would give the fish to me if I would take them.

Robert was a fine young man, who was very friendly and helpful. I never was contacted or asked to testify as a character witness, but if I had been I would have been glad to testify. I would be glad to testify now if I had the opportunity.

Further affiant sayeth now.

/s/ Miles Douglas
Miles Douglas

Subscribed and sworn to before me this 23rd day of April, 1988.

/s/ Karen Billing
Notary Public

2/22/89

Exhibit No. 24

State of Oklahoma

County of Carter

I, Gregory Lynn Johnson, of lawful age and being first duly sworn upon oath, do swear and state as follows:

I met Robert Brecheen when we were in the 7th grade, when his family moved to Springer from Comanche. We became friends right away as he was the kind of person you could quickly take a liking to. Robert was a very good student and never had any problems in school, with teachers or with any of the other kids. Everyone liked him and he got along with them all.

Robert and I spent a lot of time together. We worked together on a lot of projects, including building a bunkhouse on the Brecheen property. We also built a rent house for Dan and Velma Roberts. We played basketball together. Robert was a hard worker. Robert and I talked a lot about sports, mostly basketball and football. We went fishing a few times, but mostly we worked together after school and in the summertime. We cleaned up the schools and the grounds for a little extra money.

I cannot believe that Robert could commit a murder because it just was not in his makeup or personality to do such a thing.

Robert and I were involved in 4–H Club for several years. We learned to graft trees in order to get larger pecans. We then did demonstrations at other clubs to show how it was done.

Robert and I were also involved in track. Robert was a long distance runner and was pretty good. We had a track meet at least once a year and we always looked forward to that.

Exhibit No. 25

State of Oklahoma

County of Carter

I, JAMES MIMS, of lawful age and being first duly sworn upon oath, do swear and state as follows:

While Robert Brecheen was in the Carter County Jail awaiting trial, I happened to be arrested for DUI and placed in the same jail. Robert recognized me as he knew my brother, Alvie Mims. I was in jail overnight and Robert and I had a long conversation. He gave me some cigarettes and he told me he did not commit the crime he had been accused of.

While I was there I never saw Robert in any kind of trouble with the jailers or guards.

I had know Robert slightly before this happened as he would come down on Main Street in Ardmore and shoot pool. To me, he seemed like a friendly and nice person. I never saw him in any trouble and I never saw him behave in a mean way.

Further, affiant saieth not.

/s/ James Mims
James Mims

Subscribed and sworn to before me this 23rd day of April, 1988.

/s/ Karen Billing
Notary Public

My Commission Expires:

2/22/89

Exhibit No. 26

State of Oklahoma

County of Carter

I, THERESE NEEDHAM, of lawful age and being first duly sworn upon oath, do swear and state as follows:

I met Robert Brecheen when he worked with my husband at Lindsay Well Service. He would stop by our house to visit with my husband. He was always a happy go lucky fellow, jolly and even tempered. I trusted him and would trust him today with my life.

Robert often helped out around our house with whatever chores needed to be done. He would cut wood, or help out in anyway he could. He was always there when we needed him. Often he would just stop by to say hello and see if anything needed doing.

I would have been glad to testify as a character witness for Robert, but I was never contacted by anyone about it. I would be glad to testify now if it were possible.

Further, affiant sayeth not.

/s/ Therese Needham
Therese Needham

Subscribed and sworn to before me this 23rd day of April, 1988.

/s/ Karen Billing
Notary Public

My Commission Expires:

2/22/89

Exhibit No. 27

State of Oklahoma

County of Carter

I, RICHARD LEE NEEDHAM, of lawful age and being first duly sworn upon oath, do swear and state as follows:

I met Robert Brecheen in 1976 when I moved to Oklahoma from New Hampshire. I began to work for Lindsay Well Service and Robert and I worked the same crew. Robert was the supervisor and was a very hard worker. He was well liked by all the crew and never lost his temper or picked fights. I never saw him to show any violent

tendencies. I never knew him to have any trouble with anyone.

We worked out of town together and often shared a motel room when we were working. Robert liked to have a good time, joke around and have fun. We would go out together and have a pretty good time. I never saw him get in any fights, or get mad about anything.

Robert knew my parents and would often visit in their home for several hours at a time, just talking and visiting. He also helped out around the house with whatever needed to be done.

I would have testified for Robert at his trial if I had been asked to do so, but I was never contacted or asked to come to the trial. I would testify now if I could.

Further affiant sayeth not.

/s/ Richard Lee Needham
Richard Lee Needham

Subscribed and sworn to before me this 23 day of April, 1988.

/s/ Karen Billing
Notary Public

My Commission Expires:
2/22/89

Exhibit No. 28

State of Oklahoma

County of Carter

I, Glen Ray Needham, of HC 63, Box 50, Graham, Oklahoma, of lawful age and being first duly sworn upon oath, do swear and state as follows:

I moved from New Hampshire in 1976 to Oklahoma and went to work as a mechanic. I met Robert Brecheen when we both worked at Lindsay Well Service. Robert was a rig operator. Robert was very reliable and dependable and never lost his temper or got into fights. I always knew Robert as a jolly, happy boy. He was a good friend and was always willing to help folks out if needed. He helped us many times around the house, cutting wood or helping with any other type of chore that needed doing. He would al-

ways make it a point to visit us at least once a year after he was older, usually at Christmastime.

I was never contacted by Robert's attorney or asked to testify in his behalf. I would have been glad to testify if I had been called and would testify now if I could.

Robert is a good young man and I still don't think he did it and I don't think he should have got the death penalty.

Further, affiant saieth not.

/s/ Glen Ray Needham
Glen Ray Needham

Subscribed and sworn to before me this 23rd day of April, 1988.

/s/ Karen Billing
Notary Public

My Commission Expires:
2/22/89

Exhibit No. 29

State of Oklahoma

County of Carter

I Glenn Robert Needham, of lawful age and being first duly sworn upon oath, do swear and state as follows:

My family moved from New Hampshire in 1976 to Graham Oklahoma. I met Robert Brecheen when my brother Richard started working for Lindsay Well Service. Robert was one of the first people to visit our place and help us get settled. He helped cut and stack firewood and helped dig our septic tank hole and lateral lines. He was always ready to help whenever anything needed to be done.

Even when he was older, Robert would always come by our house at Christmas time to say hello and visit.

I would have testified at Robert's trial if anyone had asked me, but noone ever did. I would testify now if I was asked to do so.

Further affiant saieth not.

/s/ Glenn Robert Needham
Glenn Robert Needham

Subscribed and sworn to before me this 23RD day of April, 1988.

/s/ Karen Billing
Notary Public

My Commission Expires:

2/22/88

Exhibit No. 30

State of Oklahoma

County of Carter

I, Simel Pickens, of Ardmore, Oklahoma, of lawful age and being first duly sworn upon oath do swear and state as follows:

I have known Robert Brecheen for years, since he and my son were in school in Graham together. Robert was a good boy, good natured and never in any trouble. I never knew him to be any trouble or to be violent in any way.

Robert came to our house often and I came up to their house to help Robert work the garden. Robert was always available to help me whenever I needed help or whenever I asked for his help.

No one ever asked me to testify as a character witness but I would have done so if I had been contacted. I would be willing to testify today for Robert if I had a chance. I was surprised when I learned of Robert's troubles because Robert is not the type to have done what they say he done. I think he was framed because I don't think he did it.

Further affiant sayeth not.

/s/ Simel Pickens
Simel Pickens

Subscribed and sworn to before me this 23rd day of April, 1988.

/s/ Karen Billing
Notary Public

My Commission Expires:

2/22/89

Exhibit No. 31

Affidavit

State of Oklahoma

County of Carter

I, DOVIE SMITHERS, P.O. Box 193, Springer, Oklahoma, of lawful age and being first duly sworn upon oath, do swear and state as follows:

I have known Robert Brecheen since 1965 as he attended school and church with my children in Milo. He often visited our home overnight. I have never known Robert to cause any trouble. He was always quiet, well-behaved and very courteous.

I was never contacted by Robert's attorney or asked to testify at his trial. If I had been asked, I would have been willing to testify in Robert's behalf. I would have wanted to tell the jury that even if Robert committed this crime, he is a kind person and deserves a second chance.

Further, affiant sayeth not.

/s/ Dovie Springer
Dovie Springer

Subscribed and sworn to before me, this 22nd day of April, 1988.

/s/ Signature
Notary Public

My Commission Expires:

May 22, 1991

Exhibit No. 32

State of Oklahoma

County of Carter

I, LESSIE TRAVIS WRIGHT, of lawful age and being first duly sworn upon oath do swear and state as follows:

I remember when Robert Brecheen and his family first moved to Springer, they moved near to my home and Robert began going to school with my boys. Robert would come over to our house and play with my boys. Every time I met Robert, he was the same person every time. He was real nice. I never knowed him to be in a fight or lose his temper. He was always willing to pitch in and help with whatever chore my boys were doing, cutting wood, unloading the trucks or whatever. He was always polite and respectful. He was very good natured and always seemed to be in a good mood.

I felt very bad when I heard about the murder charge. I just couldn't believe that Robert would do such a thing.

I would have wanted to testify at Robert's trial if I knew it would help Robert, but I was never asked to do so. I would gladly testify now if I had the opportunity.

Further affiant saieth not.

/s/ Lessie Travis Wright
Lessie Travis Wright

Subscribed and sworn to before me this 25th day of April, 1988.

/s/ Karen Billing
Notary Public

My Commission Expires:

2/22/89

## AFFIDAVIT

### State of Oklahoma

### County of _____

I, B. Brian Leitch, III, of lawful age and being first duly sworn upon oath, do swear and state that the matters set forth below are true and correct.

For several years, from approximately the summer of 1978 through the early part of 1982, I got to know Robert Brecheen personally, and in fact got to know his mother and father very well. I spent a lot of time with them in Oklahoma, both on business and socially.

During that time, I was involved in the drilling of some oil wells between Sulphur and Davis, Oklahoma, and at one time, I was contemplating the purchase of a completion rig and putting Robert into business.

Robert always struck me as the kind of individual who could get along well with both the blue collar working type of individual and the white collar executive type of individual. He seemed to be confident and relaxed in any social situation and was able to mingle and socialize very well with all of us. Robert traveled with me and the president of the company in our private airplane from Dallas to Houston to look at completion rigs. Robert struck me as the kind of individual who

could lead other individuals and that is why I considered putting him into business. In fact, three other businessmen here in Dallas who are very successful and myself were planning to buy a completion rig at an approximate cost of $500,000 and put Robert into business. We would have done so had the bottom not fallen out of the oil business at about that time and the need for completion rigs believe it at this time. I thought enough of Robert that I personally drove to Ardmore to visit him in jail and to talk with his mother. Knowing Robert as I did, I still find it impossible to believe that he could be involved in such a thing.

I would gladly have testified as a character witness at Robert's trial, but I was never contacted by his trial counsel.

Further affiant sayeth not.

/s/ B. Brian Leitch III
B. Brian Leitch III
Attorney at Law
210 Adolphus Tower
1412 Main Street
Dallas, TX 75202

Subscribed and sworn to before me this 30th day of June, 1988.

/s/ Ann Francis
Notary Public

My Commission Expires:

September 30, 1988

## AFFIDAVIT

### State of Oklahoma

### County of Carter

I, David Fuller, being of lawful age, after first being duly sworn, do hereby state the following:

I worked with Robert A. Brecheen at Lincoln Rock. After he was charged with murder, I visited him in the county jail. Prior to his arrest, Robert had been a guest in my home. We often played cards and dominoes together. Robert was liked by both my wife and child. Robert had visited in my home seven or eight times.

During Robert's trial, I wanted to let him know that I was still his friend. On the day

he was found guilty and the jury imposed the death sentence, I was present at the Carter County Courthouse for his trial. On that day, his attorney, Gary Sleeper, asked me if I would testify for Robert. I told the attorney that I would testify that Robert was not a violent person and that he had visited in my home and was liked by me and my family. I told Gary Sleeper that, despite the fact that Robert and I had had a disagreement on one occasion about who was supposed to check an oil well, I still considered him a friend and did not believe he was a killer. Mr. Sleeper did not call me to testify.

In a telephone conversation with Gloyd McCoy, Robert Brecheen's present attorney, I related that I believed Robert Brecheen was a "god-fearing man". I also told Mr. McCoy that if I had had the money at the time of the trial of Robert Brecheen, I would have given it to Robert to hire an attorney.

Further affiant sayeth not.

/s/ David Fuller
David Fuller

Subscribed and sworn to before me this 10 day of August, 1988.

/s/ Signature
Notary

My Commission Expires:

March 2, 1991

## AFFIDAVIT

County of Harris

State of Texas

I, R.W. Oglesby, being of legal age, do solemnly swear and state as follows:

I am a retired store owner who has known Robert Allen Brecheen all his life; he is, and always has been, a fine upstanding man; I would have testified to his character at trial if his attorney had asked me to do so.

Further affiant saith not.

/s/ R.W. Oglesby
(Name)

Subscribed and sworn to me on this the 26th day of November, 1986.

/s/ Signature
Notary Public

My commission expires:

11-30-88

## AFFIDAVIT

County of Carter

State of Oklahoma

I, Patricia Smithers, being of legal age, do solemnly swear and state as follows:

I first met Robert Brecheen at the Milo Baptist Church in the spring of 1969; my sisters and I had just moved to Milo to live with our grandmother, we sat with her at church; I noticed the "youth group" sat together in the back in the back three pews; Robert [Brecheen] asked us to join them, he was a real nice fellow; we had ice cream socials and watermelon feasts and youth rallies; I got to know him real well; he and his brothers and sisters would come to our house for homemade pizza or spaghetti; my sisters and I would go to their house for dinner, too; we played alot of basketball in the backyard, the goal was nailed to the barn; some of the kids did not want my little sister to play because she is mentally retarded, but Robert [Brecheen] would make them let her play; he'd keep them from making fun of her, he had a good sense of fair play;

I would have testified as to his good character if his trial attorney had asked me to do so.

Further affiant saith not.

/s/ Patricia Smithers
(Name)

Subscribed and sworn to me on this the 24th day of November, 1986.

/s/ Elaine Harrison
Notary Public

My commission expires:

10-31-89

## ·AFFIDAVIT

County of ⸻

State of Oklahoma

I, <u>S.M. Stevenson</u>, being of legal age, do solemnly swear and state as follows:

I am a retired minister who has known Robert Allen Brecheen for the past thirteen years; he has always conducted himself in wonderfully manly fashion; I would have testified to his fine character at trial if his attorney had asked me to do so.

Further affiant saith not.

/s/ <u>S.M. Stevenson</u>
(Name)

Subscribed and sworn to me on this the <u>24th</u> day of November, 1986.

/s/ <u>Teresa Johnson</u>
Notary Public

My commission expires:

<u>3–6–89</u>

## AFFIDAVIT

County of ⸻

State of Oklahoma

I, <u>Larry Babcock</u>, being of legal age, do solemnly swear and state as follows:

I have known Robert Allen Brecheen for <u>16</u> years; I would have testified to his good character at trial if his attorney had asked me to do so.

Further affiant saith not.

/s/ <u>Larry Babcock</u>
(Name)

Subscribed and sworn to me on this the <u>30th</u> day of November, 1986.

/s/ <u>Sandra G. Babcock</u>
Notary Public

My commission expires:

<u>3–7–87</u>

## AFFIDAVIT

County of ⸻

State of Oklahoma

I, <u>Sandra Babcock</u>, being of legal age, do solemnly swear and state as follows:

I have known Robert Allen Brecheen for the past eighteen years; we went to school together, and also attended many of the same church functions; I would have testified in his behalf at his trial if his attorney had asked me to do so.

Further affiant saith not.

/s/ <u>Sandra Babcock</u>
(Name)

Subscribed and sworn to me on this the <u>30th</u> day of November, 1986.

/s/ <u>Sandra G. Babcock</u>
Notary Public

My commission expires:

<u>3–7–87</u>